# 15-888

IN THE

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

CATHLEEN GRAZIADIO,

*Plaintiff-Appellant,*

v.

CULINARY INSTITUTE OF AMERICA, SHAYNAN GARRIOCH, in her individual capacity, and LOREEN GARDELLA, in her individual capacity,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court for the Southern District of New York*

## PLAINTIFF-APPELLANT'S BRIEF

Dated:  Rhinebeck, New York
July 7, 2015

Nathaniel K. Charny
Charny & Associates
9 West Market Street
Rhinebeck, New York  12572
845-876-7500

Attorneys for Plaintiff-Appellant

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..........................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................2

STATEMENT OF THE CASE.................................................................3

SUMMARY OF THE ARGUMENT .....................................................11

ARGUMENT ........................................................................................12

    I.      STANDARD OF REVIEW ............................................................12

    II.    GRAZIADIO'S INTERFERENCE
          CLAIM SHOULD PROCEED TO TRIAL .......................................13

          A.     Elements of FMLA Interference Claims .................................13

          B.     The First Four Elements are Undisputed .................................14

          C.     Graziadio, Rightfully,
                Secured Certain FMLA Designations.......................................15

                1.     Graziadio's Leave and Return to
                      Work on Intermittent Leave for Vincent ......................15

                2.     The Additional Need for Leave to Care for TJ..............16

                 3.     CIA's Approval of all the Combined FMLA Leave .......17

## TABLE OF CONTENTS (continued)

D.    Garrioch and her Agent/Counsel Lynett
Interfered with Graziadio's FMLA Secured Rights .................20

    1.    Garrioch Refused to Allow
Graziadio to Return to Work .........................................20

    2.    Garrioch's July 17 Demands Regarding the
Leave for Vincent Were Out of Time and Unjustified...22

    3.    The Request for Certification
Regarding TJ was Improper ...........................................25

    4.    Graziadio's Zealous Efforts to Comply .........................28

    5.    Garrioch's Interference By
Cutting Off All Forms of Communication ....................33

    6.    Garrioch Interfered with Graziadio's
Zealous and Good Faith Efforts to Return to Work .......35

    7.    CIA's Continued Interference
By its Agent Attorney Lynett ........................................39

IV.    THE RETALIATION CLAIMS
SHOULD PROCEED TO THE FACTFINDER ................................46

    A.    Graziadio's Prima Facie Case ...................................................47

    B.    Evidence of Pretext ..................................................................47

    1.    Standard ..........................................................................47

    2.    The Refusal to Return Graziadio to Work....................48

    3.    The Termination ............................................................50

    4.    Additional Evidence of Pretext ....................................51

# **TABLE OF CONTENTS (continued)**

V.     DEFENDANT GARRIOCH IS
        AN "EMPLOYER" UNDER THE ACT ............................................. 55

VI.    GRAZIADIO'S ADA CLAIMS
        SHOULD PROCEED TO THE JURY ............................................. 56

CONCLUSION ..................................................................................... 58

SPECIAL APPENDIX

   Opinion and Order ...................................................................... SA1

   Judgment ................................................................................... SA21

CERTIFICATE OF COMPLIANCE ........................................... Last Page

## TABLE OF AUTHORITIES

## CASES

Abdel-Khalek v. Ernst & Young, L.L.P., 97-cv-4514 (JGK),
1999 WL 190790 (S.D.N.Y. Apr. 7, 1999) ............................................56

Aboulhosn v. Merrill Lynch, Pierce, Fenner & Smith Inc.,
940 F.Supp.2d 1203 (C.D.Cal. 2013) ...................................................33

Allen v. Verizon Wireless, 12-cv-482 (JCH),
2013 WL 2467923 (D.Conn. June 6, 2013)...........................................33

Altman v. Port Auth. of New York & New Jersey,
879 F.Supp. 345 (S.D.N.Y. 1995)........................................................52

Balko v. Ukrainian Nat. Fed. Credit Union, 13-cv-1333 (LAK/AJP),
2014 WL 1377580 (S.D.N.Y. Mar. 28, 2014).......................................48

Baucom v Cabarrus Eye Ctr., P.A., 06-cv-209,
2008 WL 5191921 (MDNC Dec. 10, 2008) ..........................................31

Becker v. Buffalo Public, 2013 WL 904088 (W.D.N.Y. 2013) ..............................50

Bowman v. Holopack Int'l Corp., 06-cv-1648 (CMC/BM),
2007 WL 4481130 (D.S.C. Dec. 19, 2007) ...........................................46

Bradley v. Mary Rutan Hosp. Assoc., 322 F.Supp.2d 926 (S.D.Ohio 2004)..........46

Brady v United Refrig., Inc., 13-cv-6008,
2015 WL 3513302 (ED Pa. June 4, 2015)........................................ 25, 31

Bussey v. Bd. of Trustees of Cmty. Coll. Dist. No. 508, 09-cv-1962,
2010 WL 3075506 (N.D.Ill. Aug. 3, 2010) ...........................................46

Carpo v. Wartburg Lutheran Home for the Aging, 05-cv-1169 (JG),
2006 WL 2946315 (E.D.N.Y. Oct. 16, 2006).........................................38

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986) .............................13

Colon v. Fashion Inst. of Tech. (State Univ. of New York),
12-cv-7405 (HB), 2013 WL 5677047 (S.D.N.Y. Oct. 18, 2013) ...........................14

Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775 (2d Cir. 2003) .................13

Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1085 (10th Cir. 1997) .............56

Dessources v. American Conference Institute,
2013 WL 2099251 (S.D.N.Y. 2013)......................................................57

iv

## TABLE OF AUTHORITIES (continued)

Esser v. Rainbow Adver. Sales Corp., 448 F.Supp.2d 574 (S.D.N.Y. 2006)..........13

Fitch v. R.J. Reynolds Tobacco Co., 675 F.Supp. 133 (S.D.N.Y. 1987) ...............52

Garcia v. Renaissance Global Logistics, LLC,
10-cv-13122, 2011 WL 721843 (E.D.Mich. Feb. 23, 2011) ..................................46

Hansen v Fincantieri Marine Group, LLC, 763 F.3d 832 (7th Cir 2014) ........ 27, 31

Huminski v. Corsones, 396 F.3d 53 (2d Cir. 2005).......................................... 12, 13

Ion v. Chevron USA, Inc., 731 F.3d 379 (5th Cir. 2013) .........................................48

James v. N.Y. Racing Ass'n, 233 F.3d 149 (2d Cir. 2000)......................................48

Kauffman v Fed. Exp. Corp., 426 F.3d 880 (7th Cir 2005)....................................27

Konipol v. Restaurant Assoc.,
01-cv-7857, 2002 WL 31618825 (S.D.N.Y. Nov. 20, 2002) ........................... 23, 31

Kwan v. Andalex Grp. LLC, 737 F.3d 834 (2d Cir. 2013) .....................................48

LaFay v. Micron Tech., Inc., 05-cv-287 (BLW),
2006 WL 3394802 (D.Idaho Nov. 21, 2006)..........................................................34

Larimer v. Int'l Bus. Machines Corp., 370 F.3d 698 (7th Cir.2004) ............... 56, 57

Marrero v. Camden Board, 164 F.Supp.2d 455 (D.N.J. 2001)...............................27

Marrero v. Camden Cnty. Bd. of Soc. Servs.,
164 F.Supp.2d 455 (D.N.J. 2001) ..........................................................................16

McDougal v Altec Indus., Inc., 553 F.Supp.2d 862 (W.D.KY 2008)....................31

Millea v. Metro-N. R. Co., 658 F.3d 154 (2d Cir. 2011)........................................47

Miller v AT & T Corp., 250 F.3d 820 (4th Cir. 2001) ...........................................27

Morris v. VCW Inc., 95-cv-0737,
1996 WL 429014 (W.D.Mo. July 24, 1996)...........................................................27

Mueller v J.P. Morgan Chase & Co., 05-cv-560 (OS),
2007 WL 915160 (ND Ohio Mar. 23, 2007) ..........................................................25

Mullins v. Bondib Hotels, Inc., 10-cv-4069 (PAC),
2011 WL 6434328 (S.D.N.Y. Dec. 22, 2011) ........................................................48

## TABLE OF AUTHORITIES (continued)

Nembhard v. Mem'l Sloan Kettering Cancer Ctr., 104 F.3d 353 (2d Cir. 1996) ....54

Parsons v. Principal Life Ins. Co., 686 F.Supp.2d 906 (S.D. Iowa 2010)..............49

Pellegrino v. County of Orange, 313 F.Supp.2d 303 (S.D.N.Y. 2004)..................47

Peter v. Lincoln Technical Inst., Inc., 255 F.Supp.2d 417 (E.D.Pa. 2002) .............33

Reid v. SmithKline Beecham Corp., 366 F. Supp.2d 989 (S.D.Cal. 2005) ............46

Richardson v. CVS Corp., 207 F.Supp.2d 733 (E.D.Tenn. 2001)...........................46

Sass v. MTA Bus Co., 10-cv-4079 (MKB),
2014 WL 585418 (E.D.N.Y. Feb. 14, 2014) ...........................................................48

Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) .......................................46

Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161 (2d Cir. 2006) ................... 13, 14, 38

Stoler v. Inst. for Integrative Nutrition, 13-cv-1275,
2013 WL 6068598, at *12 (S.D.N.Y. Nov. 18, 2013)............................................48

Stroder v. United Parcel Serv., Inc.,
750 F.Supp.2d 582 (M.D.N.C. 2010) ....................................................... 15, 23, 31

Thurston v. Cherry Hill Triplex, 941 F.Supp.2d 520 (D.N.J. 2008) ......................46

Uema v. Nippon Exp. Hawaii, Inc., 26 F.Supp.2d 1241 (D. Haw. 1998)........ 27, 35

Univ. of Texas v. Nassar, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)......................48

Wanamaker v. Town of Westport Bd. of Educ.,
11-cv-1791 (MPS), 2014 WL 1281937 (D.Conn. Mar. 27, 2014) .........................48

Weinstock v. Columbia Univ., 224 F.3d 33 (2d Cir. 2000) ....................................50

Weiss v. JPMorgan Chase & Co., 332 F.App'x 659, 663-64 (2d Cir. 2009) ..........52

Weiss v. JPMorgan Chase & Co., 332 F.App'x 659, 663-64 (2d Cir. 2009) ..........52

Whitman v. Proconex, Inc., 08-cv-2667 (RBS),
2009 WL 141847 (E.D.Pa. Jan. 20, 2009)..............................................................35

Widomski v. State Univ. of New York (SUNY) at Orange,
933 F.Supp.2d 534, 550-51 (S.D.N.Y. 2013) .........................................................47

Willoughby v Connecticut Container Corp., 11-cv-00992 (CSH),
2013 WL 6198210 (D.Conn. Nov. 27, 2013) .........................................................32

Young v. Wackenhut Corp., 10-cv-2608 (DMC),
2013 WL 435971 (D.N.J. Feb. 1, 2013) .................................................................50

**TABLE OF AUTHORITIES (continued)**

Zahler v. Empire Merchants, LLC, 11-cv-3163 (JG/CLP),
2012 WL 273698 (E.D.N.Y. Jan. 31, 2012) ..................................................... 13, 38

Zubulake v. UBS Warburg LLC., 382 F.Supp.2d 536 (S.D.N.Y. 2005).................51

**STATUTES**

28 U.S.C. § 1291 ....................................................................................................2

28 U.S.C. § 1367 ....................................................................................................1

28 U.S.C. § 1331 ....................................................................................................1

29 U.S.C. §§ 2601 et seq. .......................................................................................1

29 U.S.C. § 2613 ........................................................................................ 24, 31, 32

42 U.S.C. §§ 12101 et seq. .....................................................................................1

New York Executive Law §§ 292 et seq. ...............................................................1

**REGULATIONS**

29 C.F.R. § 825.104 .............................................................................................14

29 C.F.R. § 825.110 .............................................................................................14

29 C.F.R. § 825.114 .............................................................................................14

29 C.F.R. § 825.113 .............................................................................................14

29 C.F.R. § 825.115 ........................................................................................ 14, 25

29 C.F.R. § 825.124 .............................................................................................31

29 C.F.R. § 825.204 ........................................................................................ 36, 38

29 C.F.R. § 825.300 ..................................................................................... 16, 23, 28

29 C.F.R. § 825.301 .............................................................................................35

29 C.F.R. § 825.302 .............................................................................................15

29 C.F.R. § 825.303 .............................................................................................15

29 C.F.R. § 825.303 .............................................................................................32

29 C.F.R. § 825.305 .............................................................................. 23, 25, 26, 27, 31

29 C.F.R. § 825.306 .............................................................................................31

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Cathleen Graziadio (herein Graziadio) filed a Complaint in the United States District Court for the Southern District of New York on February 15, 2013, asserting claims under the Family Medical Leave Act, 29 U.S.C. §§ 2601 et seq. (herein the FMLA), for interference and retaliation, and under the New York State Human Rights Law, New York Executive Law §§ 292 et seq. for discrimination in the workplace based on associational disability discrimination, all against Defendants Culinary Institute of America (herein CIA), Shay Garrioch (herein Garrioch) and Loreen Gardella (herein Gardella).

On April 22, 2013, Graziadio filed and served a First Amended Complaint which added a claim for associational disability discrimination in the workplace under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (herein the ADA).[1]

The District Court had jurisdiction over Graziadio's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction over Graziadio's state law claim existed pursuant to 28 U.S.C. § 1367.

By Opinion and Order March 20, 2015, the District Court granted Defendants' Motion for Summary Judgment and dismissed the Complaint. SA1-

---

[1] Graziadio has since abandoned her claim under the New York State Executive Law and her claims against Gardella. Hence, the "Defendants" are CIA and Garrioch.

1

20.[2]  The District Court entered judgment in favor of Defendants against Graziadio on March 23, 2015.  SA21.

On March 25, 2015, Graziadio timely appealed from that final decision and judgment.  See A3.

The U.S. Court of Appeals for the Second Circuit has jurisdiction over Graziadio's appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

This appeal presents the following issue:

1.      Did the District Court err in granting Defendants' Motion for Summary Judgment insofar as there are material questions of fact as to whether Defendants' interfered with Graziadio's right under the FMLA?

2.      Did the District Court err in granting Defendants' Motion for Summary Judgment insofar as there are material questions of act as to whether Defendants' retaliated against Graziadio for exercising her rights under the FMLA?

3.      Did the District Court err in granting Defendants' Motion for Summary Judgment insofar as there are material questions of fact as to whether Defendants' discriminated against Graziadio because of her association with someone with a disability, in violation of the ADA?

---

[2] Citations to "SA" are to the Special Appendix submitted with this Brief.  Citations to "A" are to the Joint Appendix submitted separately in four volumes.

2

## STATEMENT OF THE CASE

Graziadio began full-time employment with CIA in Hyde Park, New York as a Payroll Administrator in October 2006.  A386 at ¶ 2.

Until the events at issue in this lawsuit, Graziadio was at no time subject to discipline and by all accounts, Graziadio's work performance was exemplary. A386 at ¶¶ 2-4; A412-432.

On June 6, 2012, Graziadio's seventeen year old son Vincent Graziadio (herein Vincent) became ill and was rushed to the hospital as a result of symptoms resulting from previously undiagnosed Type I juvenile onset diabetes.  Graziadio advised Steven Strom, whose office is next to the Payroll Office, that she had to leave to attend to her son's illness.  A388 at ¶¶ 14-17.

That evening Graziadio texted her supervisor Gardella to apprise her of the situation.  The next morning June 7, 2012 at 9:13 am Graziadio sent an email to Mary Maffia, who was in charge of FMLA leave (and also a colleague within the Payroll Department) and advised her of Graziadio's status and requested that she send me the necessary FMLA paperwork.  A437.

Maffia provided Graziadio with the necessary FMLA paperwork to complete that same day.  A438-442.

On June 8, 2012, Graziadio sent an email update to Gardella within which she advised Gardella that she was working on getting the FMLA paperwork

3

completed and also offering to work from home as much as possible during the upcoming week since she had to be home to attend to Vincent.  A443.

Graziadio received an email from Maffia on June 11, 2012, within which Maffia advises that she was "ok on the paperwork" and reports that she (Maffia) will be on vacation the following week.  A444.

Graziadio responded a few minutes later with an update on Vincent's condition, which was thankfully stabilizing, but still quite precarious.  A445.

On June 15, 2012, Graziadio sent an update to Gardella (knowing that Maffia was on vacation).  A446.  In that update, Graziadio advised that she was working out a schedule so that she could return to work the following Monday, June 18, 2012.  A446.

Graziadio returned to work on June 18, 2012, with the limited schedule she had requested.  A391 at ¶ 26.  Over the course of the next ten (10) days (from June 18, 2012 through June 27, 2012) Graziadio began to drawn down on intermittent leave to deal with Vincent.  A454; see also A391-392 at ¶¶ 26, 28-29; A447.

From June 26 through June 27, 2012, Vincent was in desperate states and required Graziadio's care by way of intermittent leave, which Graziadio advised Gardella by email.  A447.  While home on intermittent leave to care for Vincent, on June 27, 2012, at approximately 1:00 pm, Graziadio received a telephone call and was told that her twelve year old son, TJ Graziadio (herein TJ) severely

4

fractured his leg playing basketball and was required to undergo emergency surgery in connection with the injury. A392 at ¶ 29.

Graziadio sent an email, at 1:30 pm, to Gardella informing her of this unfortunate turn of events. A448.

That evening, June 27, 2012, at 7:03 pm, Graziadio sent an update email to Gardella, advising her that "TJ has been admitted to the hospital had to have surgery today. Will be staying there with him. Won't be in for the rest of the week. I will contact you on Friday." A449. Gardella responded the next morning, June 28, 2012 at 8:33 am, stating: "wishing you all the best." A450.

That Friday, June 29, 2012, Graziadio sent an email to Gardella giving her the promised update. A451.

On Monday, July 2, 2012, as promised, Graziadio provided CIA with an update, that included her need for continued leave through the week at least and her expected return to work the following week "at least part time." A452. In addition, in the July 2, 2012 update, Graziadio reminded Gardella that the completed medical certification for Vincent was in her desk. A394 at ¶ 36; see also A498-499 (completed medical certification).

On Thursday, July 5, 2012, Graziadio received an email from Gardella that expresses her concern for Vincent and TJ and advises that "Mary has processed your FMLA paperwork. Thank you for getting that to us." A453-454. Gardella's

5

July 5, 2012 email to Graziadio includes an attachment, which was Graziadio's "Attendance Sheet" for which her attendance had been documented through the next day, July 6, 2012, and which designated her leave to date as FMLA leave. A454.

On Monday, July 9, 2012, Graziadio sent an email to Gardella with another update and made a proposal regarding my return to work that Thursday, July 12, 2012. A456. In this email (as she had previously) Graziadio affirmatively asks if there was additional paperwork needed. A456.

Graziadio heard no response from any one at CIA for two days so on July 11, 2012 (the day before her intended to return to work) Graziadio telephoned Gardella to discuss her return to work; no one in the Payroll Department answered. A396 at ¶ 42. Graziadio then sent an email not only again asking if there is any missing paperwork, but also inquiring about her return to work. A457.

The very next thing Grazadio heard from anyone at CIA was an email from Garrioch sent the following week, on July 17, 2012, with an attached letter that was also sent certified mail. A458-459. The attached letter takes issue with the medical certification Graziadio submitted for the leave already taken regarding Vincent, leave which had already been approved. A459. In addition the letter requests, for the first time, "paperwork" regarding the leave for TJ. Id.

6

Graziadio wrote two emails in response which provide additional information and questions. A462-465. Garrioch did not respond. So, the following day Graziadio I wrote another email, A466, reiterating the same questions and concerns.

Garrioch responded on July 20, 2012 by email. A468. Garrioch's response is again almost entirely about the medical certification that was provided (and already approved by the Payroll Department) regarding the leave for Vincent which had already been taken. Id.

Graziadio responded immediately to Garrioch's July 20, 2012 email with an email of the same date, which advises as to Graziadio's plans regarding compliance with Garrioch's demands. A469-470.

As promised, on Monday July 23, 2012, Graziadio emailed to Garrioch the doctor's note from TJ's orthopedic physician with a covering email. A471-473. In that email, Graziadio reminds Garrioch that she was prepared to return to work the following day. Id.

Garrioch responded later that afternoon, July 23, 2012 by email, still refusing to allow Graziadio back to work. A477. Garrioch concludes her July 23, 2012 email by stating that she will no longer communicate with Graziadio by email and that instead "a face to face meeting is more appropriate to resolve these

issues."  In that regard, Garrioch asks that Graziadio provide "three dates/times for this week that you are available to come into work and meet with me."

Graziadio responded immediately by email on July 23, 2012, which reattaches the doctor's note regarding TJ and asks Garrioch if she could return to work on July 25, 2012.  A478.  Garrioch responded by email at 6:46 pm refusing any continued discussion by email and refusing to allow Graziadio to return to work.  A483.

On July 24, 2012, Graziadio emailed to Garrioch an additional medical certification form regarding Vincent that Vincent's doctor's office had found on their own after a "terse" and uncooperative telephone conversation between the doctor's office and Garrioch.  A480-482; see also A657-660.

And, in response to Garrioch's email response later that evening asking, "When would you like to come in and review your documentation with me?", A281, Graziadio emailed back:  "I am available whenever you would like to meet the sooner the better as far as I am concerned so I can get back to work therefore if you are available tomorrow please let me know and I will come in."  A483.

Graziadio heard nothing for an entire week so on July 30, 2012 Graziadio sent another email to Garrioch which articulates her desperation and despair at Garrioch's interference with Graziadio's return to work.  A484.  Garrioch responded that as far as she was concerned Graziadio had not responded to her

request for my availability for a meeting, to which Graziadio responded that in fact she had, and "are you saying you did not get this email regarding the scheduling of this meeting?" A485-486 (attaching prior email that available anytime); see also A487-488 (Graziadio to Maffia and separately to Gardella requesting assistance getting back to work).

In a further desperate effort to get back to work, Graziadio advised Garrioch that (notwithstanding the family medical leave issues at home) Graziadio was withdrawing her request to return part-time, and stating an unequivocal request to return to full time work without limitation. 489; see also A405 at ¶ 78.

Garrioch responded that afternoon, August 1, 2012, with more of the same regarding scheduling a meeting as a prerequisite to anything having to do with Graziadio's job at CIA. A490. And, again, Graziadio responded that she was available "any time or day to meet with you . . . I am available to meet with you whenever you can. Just send me a day and time . . ." A455 (also asking for clarification as to employment status).

At that same time, Graziadio emailed Maffia, repeating her request for an accounting of her available FMLA time. A491. Graziadio heard nothing from Maffia so she sent an email on August 6, 2012, to Maffia, again asking for an accounting of her FMLA, A492, and to Gardella asking for assistance in securing her return to work, A493.

Graziadio received a response from Maffia mid-day August 7, 2012, which

states:

> Hey Cathy. How are you and the kids?? Sorry for the
> delay, but everything is being handled thru HR. I feel
> really bad I can't release the information to you. Loreen
> too. Mine and Loreen's hands are tied. But anyway,
> contact Shay. She has the info you are looking for. So,
> you are trying to come back? We miss you. We have a
> temp in here now, but it's not the same. I hope Vincent is
> feeling better, and TJ too! Boy, when it rains it pours!
> You've had a busy summer!! . . . So take care and call
> Shay so you can get back here soon!

A494.[3]

In response and with the writing on the wall, Graziadio met with an attorney

with expertise in the FMLA and the ADA. A407-408 at ¶ 86. As a result of that

meeting, Attorney Ranni drafted and sent to CIA's President Timothy Ryan a letter

which pleaded for Graziadio's return to work and attached all of the emails

regarding her desperate efforts to return to work. A717-718; see also A712 at

¶¶ 4-5.

One week later, Attorney Ranni received a telephone call from an executive

with CIA (Richard Mignault) advising that he would be conducting an

---

[3] As discussed infra, Defendants concede that by sending this email Maffia was violating a first of its kind and highly unusual directive from Garrioch that no one was allowed to speak with Graziadio about anything, and that everything had to be referred to Garrioch.

investigation into the matter. A7112 at ¶ 6. In fact, Mignault merely handed the matter back to Garrioch. A637.

After three weeks of silence, an attorney (Joseph Lynett) made contact with Attorney Ranni. A713-714 at ¶¶ 8-14.[4] The two attorneys agreed that especially given Attorney Ranni's condition and the apparent miscommunication regarding appropriate paperwork, "we would discuss the matter further," A713-714 at ¶ 13, and in addition that "communications would occur through counsel . . .," A714-715 at ¶17.

Seven business days later -- and with no warning -- by letter dated September 11, 2012, Graziadio was terminated from employment. The excuse given in the termination letter is that Garrioch and Attorney Lynett had determined that Graziadio had abandoned her position. A497.

Two immediate follow-up correspondence from Attorney Ranni pleading for reconsideration were to no avail. See A722-723; see also A714-715 at ¶¶ 17-21.

## SUMMARY OF THE ARGUMENT

This case is riddled with substantial and material questions of fact; the vast weight of which evince an employer, who through its newly-hired head of Human Resources (Garrioch) and her counsel (Attorney Lynett), explicitly and literally

---

[4] In the meantime, Attorney Ranni had suffered a near fatal motorcycle accident and was in intensive care and inpatient rehabilitation during this period of time, making and taking calls regarding Graziadio from his facility bed. A712 at ¶ 7.

interfered with Graziadio's FMLA leave and desperate efforts to return to work from FMLA leave beginning on July 12, 2012 and culminating with Graziadio's termination from employment on September 11, 2012 based on Attorney Lynett's contrived conclusion that Graziadio had abandoned her position.

There are three adverse employment actions, all of which constitute interference and retaliation under the FMLA and associational disability discrimination under the ADA:

(i)     Refusing to reinstate Graziadio to work with intermittent leave on July 12, 2012;

(ii)     Refusing to reinstate Graziadio to work on August 1, 2012; and

(iii)     Terminating Graziadio from employment on September 11, 2012.

If ever there was a reason for FMLA and ADA protection, it is these facts discussed in this Brief.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court's review of the District Court's grant or denial of summary judgment is de novo. Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2005).

Summary judgment may be granted only where the movant shows that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v.

12

*Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548 (1986); *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (ambiguities and facts construed in the light most favorable to the non-moving party). "Only when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party is there no genuine issue for trial." *Huminski*, 396 F.3d at 70.

## II.    GRAZIADIO'S INTERFERENCE
##         CLAIM SHOULD PROCEED TO TRIAL

### A.    Elements of FMLA Interference Claims

To establish a case for interference under the FMLA, a plaintiff must establish: "(1) that she is an eligible employee under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) that defendants denied her benefits to which she was entitled by the FMLA." *Esser v. Rainbow Adver. Sales Corp.*, 448 F.Supp.2d 574, 580 (S.D.N.Y. 2006) (citations omitted).

An employee may bring an interference claim against the employer when "the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA." *Zahler v. Empire Merchants, LLC*, 11-cv-3163 (JG/CLP), 2012 WL 273698 (E.D.N.Y. Jan. 31, 2012) (citing and quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006)). The employer's intent is irrelevant to an FMLA interference claim. *Id.* Instead,

13

"[P]laintiff need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the [adverse employment action]. She can prove this claim . . . by using either direct or circumstantial evidence, or both . . . . No scheme shifting the burden of production back and forth is required." Sista, 445 F.3d at 175–76; see also Colon v. Fashion Inst. of Tech. (State Univ. of New York), 12-cv-7405 (HB), 2013 WL 5677047 (S.D.N.Y. Oct. 18, 2013).

**B.    The First Four Elements are Undisputed**

The first four elements are undisputed: (1) Graziadio has been employed by the employer for at least 12 months and has been employed for at least 1,250 hours of service during the 12-month period immediately preceding the commencement of the leave and as such is an eligible employee under the FMLA, 29 C.F.R. § 825.110; A386 at ¶ 2; (2) CIA is "engaged in commerce or in any industry or activity affecting commerce [and] employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year" and as such is an employer under the FMLA, 29 C.F.R. § 825.104; (3) Both Vincent and TJ were subject to "inpatient care" and continuing treatment by a health care provider, 29 C.F.R. §§ 825.113(a), 825.114, 825.115, ,

14

A667-669;[5] and (4) Graziadio gave proper and timely notice of her intention to take leave for both Vincent and TJ, A388-389 at ¶¶ 14-18, A392-393 at ¶¶ 29-34.

### C. Graziadio, Rightfully, Secured Certain FMLA Designations

#### 1. Graziadio's Leave and Return to Work on Intermittent Leave for Vincent

The Payroll Department (and specifically Mary Maffia, CIA's FMLA Leave Administrator) is the authority regarding management and approval of FMLA leave. A553-557 (Maffia); A566-569 (Garrioch); A621 (Gardella); A40 at ¶ 8 (Defendants' Rule 56 Statement); A397 at ¶ 47.

Per CIA's well-established practices, once an employee notifies the Payroll Department of his/her need for FMLA leave, the Payroll Department gathers the appropriate forms to be completed (if they are deemed necessary by the Payroll Department) and sends them to the employee within five business days. A545, A546-549 (Maffia); A566-567, A611 (Garrioch); A617-619 (Gardella). This is consistent with the statutory and regulatory framework of the FMLA, which provides that once notice of a need for leave is provided, 29 C.F.R. §§ 825.302, 825.303, the burden shifts to the employer who may, but need not, request a certification from a health care provider to justify the leave, Stroder v. United Parcel Serv., Inc., 750 F.Supp.2d 582, 590-591 (M.D.N.C. 2010) (citing authority);

---

[5] Without explanation, Judge Roman asserts that the third element is in dispute. SA10.

Marrero v. Camden Cnty. Bd. of Soc. Servs., 164 F.Supp.2d 455, 465 (D.N.J. 2001).

Hence, when Graziadio's son Vincent was hospitalized on June 6, 2012 Graziadio advised and communicated with Maffia regarding her request for and need for FMLA leave. A388-389 at ¶¶ 14, 18; A437. Maffia, in turn, complied with the employer's obligation to provide both eligibility designation, 29 C.F.R. § 825.300(b)(1), and designation notice, id. at § 825.300(d)(1),within the required five business days, A389 at ¶¶ 19-20; A438-439; A440-442.

Graziadio satisfied all obligations in regards to this leave, including Graziadio's continuing updates and June 15, 2012 request to return to work the following Monday on an intermittent basis with present and future scheduling adjustments to accommodate Graziadio's care for Vincent. A387-392 at ¶¶ 9-28; A443-A446.

Graziadio returned to work on June 18, 2012. A391 at ¶ 26.

## 2.    The Additional Need for Leave to Care for TJ

Upon her return to work on June 18, 2012 and as expected and already approved, Graziadio began drawing down on her approved future intermittent leave to care for Vincent, especially to assist her son in learning how to manage his newly-diagnosed status as a diabetic. A391-392 at ¶¶ 26, 28-29; see also A447, A454.

16

Nine days' later, on June 27, 2012, and while she was home on a work day on intermittent leave caring for Vincent, A392 at ¶ 29, Graziadio learned that her son TJ suffered a severe fracture of his leg while at basketball camp and that TJ was admitted to the emergency room, id. TJ underwent emergency surgery and spent several nights in inpatient care. Id. at ¶¶ 30-32.

As she had regarding Vincent, Graziadio provided timely and proper notice to the Payroll Department of these events and of her need for additional FMLA leave not only for her continued care of Vincent, but also now (unfortunately) to care for TJ. A393-395 at ¶¶ 31-38 (referring to A448-454, A498-499).

Gardella acknowledged Graziadio's request, wishing her "all the best." A450.

### 3. CIA's Approval of all the Combined FMLA Leave

Graziadio provided regular and routine updates as to her status over the next few workdays. A451-452.

In her July 2, 2012 update, Graziadio is explicit in her explanation that she needed FMLA leave for the continued intermittent care for Vincent as well as to care for TJ ("I have been trying to figure out how I can get in there this week and I don't see how it is feasible between caring for both Vincent and TJ now. I will contact you back on Friday hopefully things will get more stabilized around here

17

by then and life can get some normal back to it and possibly back to work at least

part time."). A452 (emphasis added).

Three days later, Gardella wrote back by email, stating: "I am sorry to hear

about TJ. Please wish him and Vincent a speedy recovery. Mary has processed

your FMLA paperwork. Thank you for getting that to us." A453 (emphasis

added). Most importantly, Gardella attaches to this email Graziadio's "attendance

sheet" which explicitly designates the intermittent leave taken for Vincent since

June 18, 2012, as well as the leave taken for TJ, as FMLA leave. A453-454.

This covering email and the attached "attendance sheet" is nearly

unequivocal evidence that CIA had approved all of the leave from June 18th

onward for both Vincent (including the post-return-to-work intermittent leave) and

TJ (including Graziadio's full-time absence) as FMLA leave. A405-406 at ¶¶ 78-

81, A568-569 (Garrioch explaining same), A621 (Gardella explaining same).

Judge Roman engages in blatant fact-finding here, concluding that Graziadio

"never actually sought to take additional leave for Vincent [after June 18, 2012]

. . ." SA11; see also SA3 ("The parties agree, however, that Plaintiff did not

request any further leave to care for Vincent thereafter."). Judge Roman ignores all

of the evidence cited above which is unequivocal that Graziadio requested and

received intermittent leave to care for Vincent beginning June 18th up through and

including June 27, 2012 when she took off to deal with TJ, as well. Instead, Judge

18

Roman cites to a single page of Graziadio's deposition (A196) which is confused at best, and which concludes with the following colloquy:

> Q:   Since June 18 to June 27, 2012, you didn't leave in connection with your son Vincent, is that correct?
>
> A:   I don't remember.

A196; cf. A391-392 at ¶¶ 25-29.

Judge Roman recognizes the weakness of his fact-finding here, concluding with similar fact-finder's logic that "[o]ne possible exception to this is the first five days Plaintiff argues she took for Vincent the week she returned to work in June 2012, but even if taken, approval or non-approval of those days is tangential to the merits," SA11 at n.2 (emphasis added).  Putting aside that Judge Roman is wrong -- it was ten (10) days, not five (5) days that Graziadio was back to work with intermittent leave before TJ's injury -- Judge Roman's conclusion that this is "tangential" to the merits is belied by the fact (discussed infra) that Judge Roman bases his decision in large part on his conclusion that there was no interference with the leave for Vincent, SA10 (calling any discussion of Vincent's leave a "distraction"), while at the same time Garrioch refused to allow Graziadio to return to work because of here conclusion that the previously taken leave for Vincent was unapproved.

What makes Judge Roman's fact-finding in this regard even more remarkable is that he refuses to hold Garrioch to the same fastidious standard

regarding deposition testimony, literally excusing Garrioch's far more "incorrect," SA10, testimony on two key issues: (i) that as far as Garrioch was concerned the previously taken leave for Vincent had never been approved, A570; and (ii) that Graziadio had never returned to work from her leave for Vincent, A572-573. <u>See</u> SA10 (excusing Garrioch for "incorrectly testifying" and for being "incorrect").[6]

### D. Garrioch and her Agent/Counsel Lynett <u>Interfered with Graziadio's FMLA Secured Rights</u>

#### 1. <u>Garrioch Refused to Allow Graziadio to Return to Work</u>

On July 9, 2012, as promised, Graziadio provided another update and advised that she was able and ready to return to work on July 12, 2012 -- at least on a part time schedule. A456; <u>see also</u> A395 at ¶ 40. Hearing no response, on July 11, 2012 Graziadio both telephoned and emailed Gardella asking not only for some response regarding her return to work, but also asking "[a]gain, if the Culinary requires any further paperwork from me please let me know." A396 at ¶¶ 42-43, A457. Graziadio received no response from anyone within the Payroll Department <u>ever again</u>. A396 at ¶ 43.

---

[6] Regarding approval of the leave for TJ, Judge Roman also engages in fact-finding, concluding that: "The Court does not agree, however, that this leave conclusively was approved." SA12 at n.3. Judge Roman dismisses the plethora of contrary evidence and instead offers only his own interpretation a single earlier email from Maffia as a "mere pleasantry," <u>Id.</u> (referring to A450 and ignoring A453-454 and its corroborating deposition testimony cited above).

In the meantime, and unbeknownst to Graziadio, sometime in the second week of July 2012 Garrioch took the unusual (and first time ever) step of forbidding Gardella and Maffia from any and all communication with Graziadio. A622-624, A630-635 (Gardella expressing regret that Garrioch was not allowing Gardella to share information with Graziadio as she normally would be allowed to do); A556-561 (Maffia); see also A514-520.

Garrioch -- now in exclusive control -- responds the following week with an emailed letter dated July 17, 2012, which for the first time in these difficult months for Graziadio:  (i) takes issue with the adequacy of the paperwork regarding the already taken leave to care for Vincent and (ii) requests "paperwork" regarding the leave for TJ.  A459.

Garrioch explains in the letter that Graziadio's previously taken FMLA time for Vincent was deemed by her to be "unjustified absences," A459, which in turn allowed Garrioch to refuse to allow Graziadio back to work, A565; see also A591-592 (Garrioch justifying refusal to allow Graziadio's return because of rule that "any employee who goes on an unauthorized leave of absence will have their employment terminated."); A725 at ¶ 8 (Human Resources staff nicknamed Garrioch "The Terminator" because of her desire and accomplishment in terminating employees on FMLA leave.).

21

## 2. Garrioch's July 17 Demands Regarding the Leave for Vincent Were Out of Time and Unjustified

First, the vast weight of the evidence is that the July 17 letter, A459, was inappropriate. "[A] letter such as this," as Garrioch explained at her deposition, is only appropriate when "our efforts to communicate have been unfruitful, and we need to ensure that everything is in writing so that there is no miscommunications between the parties." A583; see also A551 (Maffia explaining that the matter is turned over to HR to send such a letter only after there have been at least three unanswered requests for information from an employee), A397 at ¶ 47.[7] There is no record evidence of any such miscommunication or obstinacy by Graziadio. Indeed, the record evinces just the opposite.

Second, Garrioch's determination that the medical certification for Vincent was insufficient "to justify [Graziadio's] absences from the workplace," A459, was out of time. The particular medical certification at issue was submitted by Graziadio prior to June 26, 2012 and at least arguably (if not definitively) deemed sufficient on July 5, 2012 to substantiate not only the full time leave in early June, but also Graziadio's return to work with intermittent leave. A453-454.

The regulations are specific that "absent extenuating circumstances," employers are obligated to provide notice of FMLA eligibility within five days of

---

[7] Judge Roman ignores all of this evidence, instead summarizing simply that "Garrioch took control of the communication." SA10.

the date the leave is requested. 29 C.F.R. §§ 825.300(b), (d). Given that the July 17th letter came more than twenty (20) days after Graziadio submitted the form, and twelve (12) days after CIA by all accounts approved the leave, Garrioch's deemed deficiency was out of time -- and there is no evidence of any "extenuating circumstances" allowing Garrioch to revisit the issue.

Third, Garrioch's claimed deficiency raises material questions of fact. Stroder, 750 F.Supp.2d at 594 (sufficiency of the information provided is a jury question); Konipol v. Restaurant Assoc., 01-cv-7857, 2002 WL 31618825, at *5-6 (S.D.N.Y. Nov. 20, 2002) (same); see also infra pp. 30-31. Garrioch's required articulated deficiency, see 29 C.F.R. § 825.305(c), is comprised of the following: "The response to question 6 does not provide an estimate of the anticipated number of days and hours you will need leave from work to take your child to doctor's appointments for his serious health condition." A459. This is untrue as a matter of fact. The certification provided by Graziadio, see A460-461, explains Graziadio's needs regarding doctors' appointments quite specifically as follows: "[O]ffice visits every 3 to 4 months minimum and appointments with diabetes educator." A461. Hence, even if CIA and Garrioch could convince a jury that there were "extenuating circumstances" justifying their after-the-fact finding of deficiency, the claimed deficiency is untrue as a matter of fact (or at least raises a question of fact for the jury). A jury could easily conclude that Graziadio had satisfied her

23

obligation to provide "an estimate of the amount of time that such employee is

needed to care for the son, daughter, spouse, or parent

. . ."  29 U.S.C. § 2613.

CIA and Garrioch's position on this (adopted by Judge Roman acting as

jury) borders on the absurd.  Garrioch explains that she was refusing to allow

Graziadio to return to work because Graziadio's previous absences to care for

Vincent were unjustified for the following reason:  "[S]aying that someone was

going to be absent five days a week of a lifetime to care for a diabetic child wasn't

sufficient for us at the CIA to [] authorize the leave of absence . . ."  A574.  See

also A580 ("the FMLA certification that indicated she would need to be off five

days a week for lifetime of the child"), A586-587 ("This says that seven days per

week of care is required for lifetime.  And if that was true, this child wouldn't be

off away at college right now, she would be there with him supervising him 24

hours a day."), A590 ("She can't be away at work.  She has to be with him seven

days a week for his lifetime.").  Sitting as fact-finder, Judge Roman adopts this

cynical logic.  SA3 ("The certification she provided also indicated that future

intermittent leave to care for Vincent would be needed, and estimated the term of

care as '7 days per week from now through lifetime.'"), SA10 ("This conclusion

was somewhat obvious since the request was totally vague, prospective, and

24

indefinite, to the point where no employer reasonably would have approved it.").[8]

Cf. Mueller v J.P. Morgan Chase & Co., 05-cv-560 (OS), 2007 WL 915160, at *13 (ND Ohio Mar. 23, 2007) (under similar facts and citing authority that an employer's delay in effectuating intermittent leave to care for a diabetic child constitutes interference).[9]

### 3. The Request for Certification Regarding TJ was Improper

While Garrioch's July 17, 2012 letter, focused almost entirely on the leave for Vincent, it adds at the end of the letter: "In addition, I understand that you have continued to be absent from the workplace due to the health condition of another one of your children. You will also need to submit paperwork for this time off from work as well." A459.

This request for "paperwork" regarding TJ is fatally flawed in three distinct respects.

First, that CIA waited twenty (20) days from the date Graziadio gave notice of the need for leave for TJ is dispositive. See 29 C.F.R. § 825.305(b) (instructing

---

[8] Of course, Judge Roman and Garrioch are discussing two different things. Judge Roman fact-finds that Garrioch was only discussing future leave for Vincent, SA10, while all of the evidence stands for the proposition that Garrioch was refusing to return Graziadio to work because she had deemed the previously taken leave for Vincent as unapproved.

[9] In any case, the FMLA regulatory scheme contemplates the fluid nature of caring for a diabetic child. 29 C.F.R. §§ 825.115(c), (f); 29 C.F.R. § 825.302(f) (intermittent leave to be scheduled only "if applicable" and "subject to the approval of the health care provider"); Cf. Brady v United Refrig., Inc., 13-cv-6008, 2015 WL 3513302, at *12 (ED Pa. June 4, 2015).

that requests for medical certification be made "at the time the employee gives notice of the need for leave or within five business days thereafter"); see also A545 (requests are made once employee misses five consecutive days of work).  While 29 C.F.R. § 825.305(b) allows the employer to make a request for medical certification after five days, it is only if "it has reason to question the appropriateness of the leave or its duration."  29 C.F.R. § 825.305(b).  Here, there is no evidence of any sort that anything changed or any new information revealed itself that would justify the use of this loophole; the only change was that Garrioch assumed control of the FMLA process regarding Graziadio.[10]

Second, even if timely the notice itself is inadequate insofar as it (i) fails to request medical certification and instead requests merely "paperwork" and (ii) it fails to "advise [Graziadio] of the anticipated consequences of an employee's failure to provide adequate certification."  29 C.F.R. § 825.305(d).  While the letter threatens "further employment action" if Graziadio does not provide "updated paperwork within seven (7) days," this is obviously a reference to the leave for

---

[10] Judge Roman engages in fact-finding on this, concluding that this regulatory exception to the five day rule applies without question of fact because "the ever-extending duration of the leave made it reasonable and legal for CIA belatedly to seek a medical certification, to retract the approval prospectively, and to take adverse action thereafter."  SA12 at n.3; see also id. ("The duration of Plaintiff's leave for T.J. justified the late request for a medical certification.").  Judge Roman does not (and cannot) explain what it was as of July 17, 2012 that made Graziadio's FMLA leave so "ever-extending" as to unequivocally trigger this exception.  Instead, the facts are that Graziadio had already returned from leave for Vincent and was on an accepted regiment of intermittent leave, and that had Graziadio been returned to work as requested on July 12, 2012, she would have taken a very reasonable nine (9) work days of leave to care for TJ.

Vincent since (i) Graziadio had not yet been asked to nor provided any paperwork to be "updated" regarding TJ and (ii) the seven day rule does not apply to the initial request for medical certification and instead obligates an employer to provide fifteen days, compare 29 C.F.R. § 825.305(b) (15 days to provide initial requested certification) and 29 C.F.R. § 825.305(c) (7 days to supplement certification); see also Morris v. VCW Inc., 95-cv-0737, 1996 WL 429014 (W.D.Mo. July 24, 1996) ("in the real world it is not to be supposed that doctors will always answer in full compliance with statute on the first inquiry"); Marrero v. Camden Board, 164 F.Supp.2d 455, 466 (D.N.J. 2001) ("an employer cannot request certain, limited information from an employee and then [take adverse employment action against] her for not providing further information beyond that specifically requested").

Third, CIA never provided Graziadio an FMLA designation notice regarding the leave for TJ, something which "necessarily precede[s]" a request for certification. Uema v. Nippon Exp. Hawaii, Inc., 26 F.Supp.2d 1241, 1248 (D. Haw. 1998) (explaining that this is a jury question); see also Hansen v Fincantieri Marine Group, LLC, 763 F.3d 832, 842 (7th Cir 2014) (employer must provide demand for certification for each instance of leave requested); Kauffman v Fed. Exp. Corp., 426 F.3d 880, 887 (7th Cir 2005) (belated challenge to certification unjustified); Miller v AT & T Corp., 250 F.3d 820, 835-36 (4th Cir. 2001) (deficiency must be specifically identified by the employer); 29 C.F.R. §

27

825.300(c)(5) (employer obligation to "responsively answer questions from employees concerning their [FMLA] rights and responsibilities").

### 4.    Graziadio's Zealous Efforts to Comply

Immediately upon receipt of Garrioch's July 17, 2012 letter and over that day and the next, Graziadio responded with emails providing and requesting information.  A462-463 (providing a detailed explanation of the need for the leave and requesting that CIA send to Graziadio the "paperwork" to be completed for TJ), A464 (adding clarification and repeating request for forms regarding TJ), A466 (after no response for two days, proposing a return to work date and explaining that Graziadio will get a doctor's note for TJ's leave because "this is what I assume you want given past practice at CIA"), A466-467 (same).

Garrioch's response, A468, should be read in its entirety since it represents blatant interference.  In summary, Garrioch states the following:  (i) the previously taken absences are unjustified because the medical certification for Vincent only speaks to doctors' visits every three months and "your request for leave is more than once every three months.  In fact, you have been absent from the workplace since early June . . ."; (ii) concedes that the medical certification provides justification for Graziadio to "work your regular full time schedule, except what may be excused from time to time for intermittent care for your child"; (iii)

28

nonetheless refuses to allow Graziadio to return to work; and (iv) as an after-thought says, "if there is other documentation pertaining to your other son [TJ] . . ." it should be provided. A468.

Graziadio immediately responded by email, A469, providing even more clarification about her need for leave, and advising Garrioch that: (i) she has asked Vincent's doctor's office to contact Garrioch so as to find out what additional information Garrioch needs; (ii) that Graziadio will be getting a doctor's note from TJ's doctor to substantiate Graziadio's additional request for intermittent leave to care for TJ; and (iii) suggests a return to work on July 24, 2012, which is the day after Graziadio expected to secure the doctor's note from TJ's orthopedic physician. A469.

That same day, as promised, Vincent's doctor's office contacted Garrioch to try and surmise what additional information was needed in regards to the leave for Vincent.[11] See A402-403 at ¶¶ ¶¶ 62-63; A474; A657-669. Garrioch was uncooperative during the call. Id. Nonetheless, recognizing this was a "time-sensitive issue," A665-666, Nurse Kelly "went to the FMLA website and found another FMLA form that provided additional detail" and had this form signed by

---

[11] Judge Roman ignores this whole set of facts regarding Nurse Kelly.

Vincent's doctor, which in turn was provided to Garrioch on July 24, 2012 --

within the requisite seven days, A474-476; A480-482.

Similarly, within three days of Garrioch's July 17, 2012 vague request for

"paperwork" regarding TJ's leave (the request that did not mention "certification"

nor did it include a recitation of any consequences) Graziadio submitted a doctor's

note regarding TJ's injury and his need for care. A400-401 at ¶¶ 56-60; A471-473.

Graziadio provided this type of doctor's note for two reasons: (i) this was the very

same type of doctor's note from the same doctor's office that Graziadio had

provided regarding her own FMLA leave and return to work earlier that year that

had, as far as Graziadio knew, been acceptable for both the absences and the

prospective intermittent leave, id.; and (ii) TJ's doctors used a third party service

for additional paperwork that would have taken weeks to secure, A401 at ¶ 60;

A471-473; A495.

Once the doctor's note from TJ was submitted as well as the supplemental

certification from Vincent's doctor was submitted (all of which were timely if the

jury were to determine they were appropriately requested in the first instance),

there rises again the very same jury question regarding the sufficiency of the

information provided and, in particular, whether at that point Graziadio had

provided each aspect that could have been contemplated of her regarding the leave

needed to care for Vincent and TJ, including all of the elements set out in 29

30

U.S.C. § 2613(b) and 29 C.F.R. § 825.306.  Cf. 29 C.F.R. § 825.124(a); Stroder,

750 F.Supp.2d at 594 (sufficiency of the information provided is a jury question);

Konipol v. Restaurant Assoc., 01-cv-7857, 2002 WL 31618825, at *5-6 (S.D.N.Y.

Nov. 20, 2002) (same); see also Hansen v Fincantieri Marine Group, LLC, 763

F.3d 832, 845 (7th Cir. 2014); Brady v United Refrig., Inc., 13-cv- 6008, 2015 WL

3513302, at *7 (ED Pa June 4, 2015) (question of fact where employee is

terminated while employer is seeking additional information regarding intermittent

leave under 29 U.S.C. § 2613); McDougal v Altec Indus., Inc., 553 F.Supp.2d 862,

869 (WD KY 2008) (question of fact regarding prior approval as well as

sufficiency of the certification warrants denial of summary judgment); Baucom v

Cabarrus Eye Ctr., P.A., 06-cv-209 (WLO), 2008 WL 5191921, at *6 (MDNC

Dec. 10, 2008)

Even further, regarding the doctor's note for TJ, CIA and Garrioch failed to

provide any statement of "what additional information is necessary to make the

certification complete and sufficient."  29 C.F.R. § 825.305(c).  The record in this

regard is limited to a single email from Garrioch dated July 23, 2012, A477, within

which Garrioch articulates the following and only regarding the doctor's note for

TJ's leave:  "With regards to the note that you attached to this email it does not

state that there was any medical necessity for you to provide full time care.  I

cannot allow you to return to work until you have presented sufficient

documentation to justify your absences as being medically necessary under FMLA law."  A477.  As to the "paperwork" for Vincent's leave, Garrioch merely states:  "I [] continue to not have what the CIA requires to justify your absences from the workplace."  Id.

Again, Garrioch's justification for refusing to allow Graziadio to return to work continues as of this date to be almost exclusively about the previously-taken leave being unexcused.  A468 (Vincent certification sufficient for Graziadio to "work your regular full time schedule, except what may be excused from time to time for intermittent care for your child"), A477[12] (Vincent certification does not "justify your absences from the workplace" and TJ paperwork insufficient because "[i]t does not state that there was any medical necessity for you to provide full time care").[13]

_____

[12] Garrioch thought the return to work part-time was exclusively for Vincent, A574, and as such it is apparent that the first sentence in the July 23, 2012 email from Garrioch, A477 ("I continue to not have any paperwork which justifies your returning to work on a partial work schedule.") is regarding the paperwork for the leave for Vincent and has nothing to do with TJ.

[13] All of this is for naught since the FMLA requires the employer to consider all information provided in determining FMLA eligibility and not just information provided on a requested certification.  This is explicit in the statute itself, which does not mandate medical certification and instead makes it permissive.  29 USCA § 2613(a); see also 29 C.F.R. § 825.303(b) ("The employer will be expected to obtain any additional required information through informal means."); Willoughby v Connecticut Container Corp., 11-cv-00992 (CSH), 2013 WL 6198210, at *19 (D.Conn. Nov. 27, 2013) (same).  Here, the vast weight of the evidence supports the conclusion that CIA had detailed explanations of Graziadio's need for leave not just from her children's doctors but also from Graziadio herself.  See A445-447, A449, A452, A455-457, A462-467, A469-471, A478, A480.

32

### 5. Garrioch's Interference By Cutting Off All Forms of Communication

What is most notable about Garrioch July 23, 2012 communication to Graziadio is it's concluding paragraph, which (i) forbids any further communication by way of email and (ii) forestalls any consequence; that is, until they are able to "meet in my office to resolve this issue accordingly." A477.

This is the very type of employer conduct that abrogates Graziadio's regulatory deadline (to the extent a jury would find such deadlines even applicable) to provide the requested supplemental information. Cf. 29 C.F.R. § 825.305(b), 29 C.F.R. § 825.305(c). See Aboulhosn v. Merrill Lynch, Pierce, Fenner & Smith Inc., 940 F.Supp.2d 1203, 1216 (C.D.Cal. 2013) (citing authority and concluding: "This deadline can be tolled, however, if warranted by the employer's conduct"); Peter v. Lincoln Technical Inst., Inc., 255 F.Supp.2d 417, 441 (E.D.Pa. 2002) (extensive analysis of FMLA's tolling provisions, concluding: "In general, what is practicable in terms of timing is based on the facts and circumstances of each case and is a question for the jury."); see also Allen v. Verizon Wireless, 12-cv-482 (JCH), 2013 WL 2467923 (D.Conn. June 6, 2013) ("The FMLA contains a built-in equitable provision in its regulations, specifying that an employee must submit requested medical certification. . . unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts."); LaFay v. Micron Tech., Inc., 05-cv-287 (BLW), 2006 WL 3394802 (D.Idaho Nov. 21,

2006) (jury question whether employer gave adequate notice and opportunity to cure deficiencies).

That CIA and Garrioch were explicitly tolling the FMLA deadlines is evident from Graziadio's efforts to communicate the following day, which were met with quick reprisals from Garrioch that further communication by email was forbidden until the face-to-face meeting. Hence, when Graziadio sent in the supplemental certification regarding Vincent the next day, A480-482, Garrioch responded with one sentence that says: "When would you like to come in and review your documentation with me?" A281. And, when Graziadio resubmitted the doctor's note for TJ the next day, A478, Garrioch repeated her position that "we will no longer be discussing these matters over email," A479 (and concluding that she was refusing to reinstate Graziadio because the previously taken leave had not been approved).

There are two additional facts (or at least fact questions) to consider. First, contrary to the CIA's rote practice (and as required under the FMLA), A545, A546-549 (Maffia); A566-567, A611 (Garrioch); A617-619 (Gardella); A503-505 (FMLA leave spreadsheet creating rubric re same), Graziadio was never sent the FMLA "paperwork" that Garrioch kept insisting was missing regarding the leave for TJ -- even though Graziadio went beyond her obligations and kept asking for it

34

to be provided.  See also A631 (Garrioch testifying that she had "verified" that Graziadio did receive the alleged missing paperwork regarding TJ.).

Second, to this very day, CIA has not provided Graziadio with the requisite designation notice regarding the leave requested for TJ.  See 29 C.F.R. § 825.300(d), Uema v. Nippon Exp. Hawaii, Inc., 26 F.Supp.2d 1241, 1247 (D.Haw. 1998); see also Whitman v. Proconex, Inc., 08-cv-2667 (RBS), 2009 WL 141847 (E.D.Pa. Jan. 20, 2009) (if prejudiced, noncompliance with notice requirements constitutes FMLA interference).

### 6.    Garrioch Interfered with Graziadio's Zealous and Good Faith Efforts to Return to Work

Graziadio's response to the July 23, 2012 email instructing that Graziadio and Garrioch must meet face-to-face before Garrioch would allow Graziadio to return to work was prompt, desperate and compliant.  Graziadio emailed to Garrioch the next day, stating:  "I am available whenever you would like to meet the sooner the better as far as I am concerned so I can get back to work therefore if you are available tomorrow please let me know and I will come in."  A483.

Garrioch never responded to this email.  A404 at ¶ 74; cf. 29 C.F.R. § 825.301(c)(5) (requiring employers to "responsively answer questions from employees").  The reason Garrioch gives for her failure to respond is strong evidence of interference:  "I can't answer off the top of my head as to the precise reason.  However, it was an e-mail sent after business hours requesting a meeting

35

for the next day when I may or may not have been in the office, may or may not have had a fully booked schedule." A598-599; cf. A117 (CIA Handbook requiring reinstatement within two days of readiness); 29 C.F.R. § 825.204(e) ("An employee may not be required to take more leave than necessary to address the circumstance that precipitated the need for leave.").

After nearly a week went by without a response from Garrioch, Graziadio again communicated, stating by email "I have yet to hear back from you to schedule a meeting you requested to have prior to allowing me to return to work. I emailed you right back a week ago and stated that I am available at any time to meet with you. There has been no response to date and it has been almost a week . . ." A484.

While Garrioch responded to this email, her response is puzzling, obstructionist and even more evidence of FMLA interference: "I asked you several times last week to provide me with possible dates and times for a meeting. I did not receive any suggestions. Would you please make at least three suggestions for dates and times so that I can tell you what works in between my previously scheduled meetings." A485-486 (It is worth noting that while Garrioch appears to have justified her lack of response to the July 24, 2012 to the fact that it was sent "after hours," this email from Garrioch was sent at 6:44 pm.).

36

This response from Garrioch was "deeply disturbing" to Graziadio, see A405 at ¶ 78, and Graziadio at this point felt that Garrioch was doing everything she could to interfere with Graziadio's reinstatement to work, id. As a result, and in a further and far more desperate effort to return to employment, Graziadio sent an email on August 1, 2012, setting out an unequivocal request to return to full time work without limitation. A489. Graziadio did so "in an effort to remove any hurdles that Shay could use to justify refusing to return me to work. I needed the job, I needed the health care, and I needed to get back to work. I was very very desperate at that point." A405-406 at ¶¶ 78-79.

Garrioch's response, sent that afternoon, reiterates more of the same transparently obstructionist positioning: "We need to meet before you can return to work as your absences to date have not been authorized. Would you please send me at least three dates and times that you are available to come in for a meeting." A490.[14]

Graziadio responded promptly with a desperate email that says "I am available to meet with you whenever you can. Just send me a day and time, I believe this is more productive than me giving you three dates and times realizing you are busy." A455. Graziadio explains in this email why she made the

---

[14] Judge Roman ignores this communication, notwithstanding that it undermines his factual determination that Garrioch was refusing to allow Graziadio to return to work not because of the previously taken leave for Vincent, but instead because of future as yet untaken leave.

unequivocal offer to return to work without limitation "in the interest of getting back to work. . ." Id.; cf. A620 (Gardella wanted her back); A514-520 (same).

    To this very day, Garrioch has not responded to this email.  And especially given that intent is irrelevant, this exchange regarding three dates and times is more than sufficient evidence of interference with Graziadio's FMLA rights.  See Zahler, 2012 WL 273698 (citing Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 176 (2d Cir. 2006)); see also 29 C.F.R. § 825.204(e) ("[a]n employee may not be required to take more leave than necessary to address the circumstance that precipitated the need for leave." Cf. Carpo v. Wartburg Lutheran Home for the Aging, 05-cv-1169 (JG), 2006 WL 2946315 (E.D.N.Y. Oct. 16, 2006) (in fitness for duty context, concluding:  "when, as here, an employer claims to find ambiguity in a return-to-work certificate that the issuing doctor can usefully clarify, the default rule, in keeping with the Congressional purpose, is that the employee must be allowed to remain on the payroll while clarification is sought").

    Hence, even putting aside the request to be returned to work part-time, once Graziadio announced on August 1, 2012 her availability to return to work full time without limitation, the FMLA, see 29 C.F.R. § 825.204(e), CIA's own rules and regulations, A117, and Judge Roman's fact-finding interpretation of the evidence, SA10 (the only issue was "future" leave for Vincent), obligated that CIA and Garrioch return Graziadio to work.

Garrioch would have nothing of these efforts by Graziadio, explaining that she was refusing to return Graziadio to work even after her withdrawal of any request for a part-time schedule because:  "At this point, as we discussed ad nauseam [at the deposition], she was not on an approved leave because she had further medical documentation that she had to submit to us, therefore, she cannot claim that she gets both the protection of being out on an unapproved leave and the protection of reinstatement."  A615 (Garrioch reviewing A489 and explaining why she did not reinstate Graziadio to work per the Handbook's two-day rule, A117).

### 7.    CIA's Continued Interference By its Agent Attorney Lynett

After waiting another week for some response from Garrioch and, as is reasonable in the context, Graziadio sought the counsel of an attorney with expertise in FMLA leave to assist her in securing reinstatement to employment. A407-408 at ¶¶ 86-87; A711-712 at ¶¶ 3-4.  As a result of that consultation (and retention), Graziadio's Attorney Joseph Ranni, sent a letter to CIA's President Timothy Ryan, see A712 at ¶¶ 2-4; A717-718, within which Attorney Ranni states without equivocation that Graziadio wished to return to work and that she stands ready to provide whatever documentation may be required by Garrioch, id.

Attorney Ranni's letter was in turn directed to CIA's Vice President of Human Resources, Richard Mignault "as would normally be the case for any such matters."  A636.  Mignault contacted Attorney Ranni soon thereafter and spoke by

telephone, advising Attorney Ranni that he would be "conducting an investigation" into the concerns raised in the letter.  A639-670 (per CIA Handbook, see A96); A712 at ¶ 6.  However, and in fact, no investigation was conducted by Mignault, A638, A651, and instead, remarkably, the matter was handed back to the alleged perpetrator of the improper conduct Garrioch "for handling," A637.

Graziadio and Attorney Ranni heard nothing from anyone at CIA for three full weeks, when Attorney Lynett called Attorney Ranni on or about August 28, 2012.  (It is not immaterial that in the meantime Attorney Ranni suffered a near fatal motorcycle accident that landed him in intensive care during this very relevant period of time.  A712-713 at ¶¶ 7-9.)  During that phone call Attorney Lynett continued to contend that absent the corrected paperwork Graziadio would not be returned to work and even if she were returned to work, she would promptly be terminated from employment because of her unauthorized absences from work. A713-714 at ¶¶ 10-14.

On August 30, 2012, Attorney Lynett sent an email to Attorney Ranni which confirms what CIA and Garrioch now contend is not true:  "Our understanding is that Ms. Graziadio wants to return to work."  A719-720.

In that email, Attorney Lynett reiterates what Garrioch had been stating since she vetoed the Payroll Department's approval of Graziadio's FMLA leave back on July 17, 2012:  "In the event Ms. Graziadio wants to return to work, I also

40

want to make perfectly clear Ms. Graziadio's obligation to submit FMLA medical

certifications if she wants the CIA to approve leave under the FMLA that she has

advised us he [sic] needed [to care for Vincent] . . ." A719 (past tense in original,

and referencing the July 17th letter).

While Attorney Lynett also addresses an undefined deficiency in the doctor's

note regarding the leave for TJ, A719 ("If Ms. Graziadio wants her absences to

take care of her son [TJ] to be approved as FMLSA leave, then she must provide a

sufficient and complete FMLA medical certification . . ."), just as with Garrioch,

he does not use it as a basis to refuse to return Graziadio to work -- insofar as he

provides time (albeit a single business day) to provide the undefined missing

information. A719.

Attorney Lynett concludes ominously: "My client wishes to convey that

Ms. Graziadio's failure to submit sufficient and complete FMLA certification

forms will result in her absences being denied FMLA protection and may subject

her to discipline under the CIA's absence control policy." A720. See also A713-

714 at ¶¶ 10-14; A408-409 at ¶¶ 91-95.[15]

---

[15] Garrioch's testimony regarding this email which forms the entire basis of CIA and Garrioch's defense regarding the discharge is oddly contradictory. At first, Garrioch insisted that she reviewed it before it was sent. A573. Once pressed with difficult questions regarding the contents of the email, Garrioch was quick to testify that she never reviewed the email before it was sent by Attorney Lynett. A610.

41

Attorney Lynett's email communication is consistent with Attorney Ranni's recollection of the telephone conversation he had with Attorney Lynett.

> [D]uring this conversation Mr. Lynett advised me CIA continued to take the position that Ms. Graziadio would not be returned to work because she had not provided sufficient support to justify her absences. While Mr. Lynett did mention the possibility of Ms. Graziadio returning to work, upon supplying sufficient support, he stated that her previous absences would remain unexcused and discipline would continue.

> We discussed that from Ms. Graziadio's perspective it would be baiting an immediate problem for the CIA to take her back and continue discipline related to the reasons for absence with the possible result of termination from employment, yet refuse to discuss what information was needed to support the leave, all of which was available.

> Mr. Lynett advised it was not the employer's obligation to explain what was missing from the paperwork and instead that it was Ms. Graziadio's obligation to comply with the statute and second that because of my August 7, 2012 letter, the CIA would no longer communicate with Ms. Graziadio and all communications must occur between counsel. I believe we had agreed that resolving the sufficiency of the documentation was elemental to return though the logistics yet to be resolved.

A713 at ¶¶ 10-12.

Seven business days later at 9:26 pm, Attorney Ranni's associate received an email from Attorney Lynett, see A721, which states that "the CIA has asked Ms. Graziadio twice within the last two week [sic] to contact her supervisor if she

42

wanted to return to work. She hasn't contacted her supervisor which only confirms that she is not interested in returning to work at the CIA. Just giving your office the heads up that the CIA will administratively terminate her employment under the circumstances." Id.

There are a host of absurdities underlying this "heads up" email from Attorney Lynett. (1) As agreed between counsel, at the time Attorney Lynett sent this email counsel were knee-deep in discussions to either clarify the requisite "paperwork" to secure Graziadio's return to work or the terms of a global settlement; the notion of a return to work was on hold. A713-715 at ¶¶ 13, 17. (2) Everyone had agreed that all communications would be exclusively through counsel. Id.; see also A410 at ¶ 99 (Graziadio); A646, A648-650 (Mignault: "Our counsel was dealing with that directly."); A612 (Garrioch). (3) No contact was made to Graziadio or Graziadio's attorney asking if Graziadio intended to return to work prior to this "heads up" email being sent. A410 at ¶ 99; see, e.g., A634 (Gardella: "I know she wanted to come to work . . . [and did not contact Graziadio regarding the return to work because Gardella was] still under this instruction not to contact her."). (4) There was never any type of date certain provided to Graziadio regarding her obligatory return to work, as was rote practice for CIA. A714-715 at ¶¶ 17-19; A613 (Garrioch: "There was no special reason to pick that exact date."); cf. A646 (Mignault refusing to answer whether Graziadio should

43

have been provided a date certain because "[t]his matter was engaged between counsel at that time.  I was not involved in these matters day to day.").[16]

Attorney Ranni, who was still in the hospital, responded at 11:00 am the next morning by email and again without equivocation states that "[t]here apparently is some confusion" and reiterates several times that Graziadio "was and is" desirous of a return to work, and asking (ne pleading) that her return to work be accommodated.  A715 at ¶ 18, A722.  Hearing nothing for two hours, Attorney Ranni sent a second email at 1:04 PM, again opening with the explanation that there was "some miscommunication concerning the above," A715 at ¶ 19, A723, and unequivocally reiterating Graziadio's desire to return to work, id.[17]

Attorney Ranni's efforts were just as unsuccessful as Graziadio's zealous, desperate and good faith efforts to get back to work that started as early as July 12,

---

[16] Note that Graziadio was terminated from employment on the seventh day after Lynett's written request for medical certifications.  Assuming the jury determines that this very-after-the-fact request from Lynett was proper, CIA pulled the trigger at least a day early insofar as the regulations allow Graziadio at least seven days to respond.

[17] During the pre-motion conference held before Judge Roman on January 17, 2014, the Court engaged in a colloquy with Defendants' counsel on this probative and material point, asking Defendants' counsel if there was ever any communication after the discharge within which Graziadio asked to be taken back to work.  A525-526 (Judge Roman asking, "[n]ot even from her former attorney?").  CIA's counsel "represent[ed] right now I don't believe so, Judge, no," id., even going as far as to say "I don't believe there was one 'please.'  There was no pleases, Judge, no sugar, no cherries."  A526 (Judge Roman concluding by asking "Nothing?  'I want to come back to work.  I can start whatever day.'" and Attorney Maheran answering, "No.").  As the record makes clear, Attorney Maheran's representations to the Court were not only inaccurate, but Judge Roman without explanation decided to ignore this probative and material point in his summary judgment decision.

44

2012.  Graziadio and her counsel's efforts failed not because of some internal

policy that CIA will not "change its mind," cf. A643-645 (Mignault, the alleged

decision maker, was never told by Garrioch or Attorney Lynett that Graziadio

pleaded for her job back only hours after Attorney Lynett's alleged "heads up"

email even though he would reconsider a  termination decision "if the facts have []

changed"), but because Garrioch and Attorney Lynett never intended to return

Graziadio to work in the first place.

    Judge Roman makes his most remarkable fact-finding in regards to

Graziadio's alleged job abandonment, concluding as a matter of fact that Graziadio

"inexplicably" never called her supervisor -- and as such there is no question of

fact that Graziadio abandoned her job.  SA13.[18]  Judge Roman literally ignores the

ample and substantial evidence explaining what occurred and why Graziadio did

not contact her supervisor in those intervening days.  See, for example, A407-A411

at ¶¶ 87-100, A711-A723.

    While there are instances where a Court may find actual job abandonment

warranting dismissal on summary judgment, where, as here, "there may have been

more to [plaintiff's] job abandonment explanation when events surround[ing the]

---

[18] CIA and Garrioch (and Judge Roman) fail to offer any explanation for their odd shift in
positioning from "we will not let you back to work because the paperwork is insufficient to
justify your previously taken absences" to "welcome back, we no longer care about deficient
paperwork regarding your prior absences, hurry up and call your supervisor."  No explanation is
offered anywhere in the record, because it is this fact that is "inexplicable."

termination are examined," summary dismissal is not warranted.  Reid v.

SmithKline Beecham Corp., 366 F. Supp.2d 989, 999-1000 (S.D.Cal. 2005);

Bradley v. Mary Rutan Hosp. Assoc., 322 F. Supp. 2d 926, 946-47 (S.D.Ohio

2004) ("Because the overall evidence is conflicting, summary judgment is not

appropriate for either party. Undoubtedly, there are genuine issues of material fact

remaining for trial."); Bowman v. Holopack Int'l Corp., 06-cv-1648 (CMC/BM),

2007 WL 4481130, at *11 (D.S.C. Dec. 19, 2007) (same); Richardson v. CVS

Corp., 207 F.Supp.2d 733, 740 (E.D.Tenn. 2001) (summary judgment

inappropriate under alleged job abandonment defense); Garcia v. Renaissance

Global Logistics, LLC, 10-cv- 13122, 2011 WL 721843, at *3 (E.D.Mich. Feb. 23,

2011) (no evidence that plaintiff abandoned her job); Bussey v. Bd. of Trustees of

Cmty. Coll. Dist. No. 508, 09-cv-1962, 2010 WL 3075506, at *7 (N.D.Ill. Aug. 3,

2010); Thurston v. Cherry Hill Triplex, 941 F.Supp.2d 520, 532-33 (D.N.J. 2008)

("A reasonable jury might rely upon this evidence and find that the rationales for

termination set forth in Defendant's letter are implausible, and that impermissible

considerations motivated Defendant's termination of Plaintiff.").

## IV.    THE RETALIATION CLAIMS
##         SHOULD PROCEED TO THE FACTFINDER

FMLA retaliation claims are evaluated under the McDonnell Douglas

framework.  In this context, courts are to be "particularly cautious" about granting

summary judgment.  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997);

46

Widomski v. State Univ. of New York (SUNY) at Orange, 933 F.Supp.2d 534,

550-51 (S.D.N.Y. 2013)

### A. Graziadio's Prima Facie Case

CIA and Garrioch do not dispute, nor can they, that (1) Graziadio exercised

her rights under the FMLA and (2) that she was qualified for her position, see

A386-387 at ¶¶ 1-5, A412-432 (performance evaluations).  As to the third prong, it

is equally undisputed that Graziadio was subject to distinct adverse employment

actions:  the failure to reinstate on and subsequent to July 12, 2012, the failure to

reinstate on and subsequent to August 1, 2012, and the termination on September

11, 2012; all of which had the purpose of "dissuad[ing] a reasonable worker in the

Graziadio's position from exercising his legal rights."  Millea v. Metro-N. R. Co.,

658 F.3d 154, 164 (2d Cir. 2011).  The fourth prong is met by way of the above-

recited evidence, which more than satisfies the "minimal" burden of the prima

facie case.  Pellegrino v. County of Orange, 313 F.Supp.2d 303, 315 (S.D.N.Y.

2004).

### B. Evidence of Pretext

#### 1. Standard

The "governing standard" for proof of pretext "is simply whether the

evidence, taken as a whole, is sufficient to support a reasonable inference that

prohibited discrimination occurred."  Mullins v. Bondib Hotels, Inc., 10-cv-4069

(PAC), 2011 WL 6434328 (S.D.N.Y. Dec. 22, 2011) (quoting James v. N.Y.

Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000)).[19]

## 2.    The Refusal to Return Graziadio to Work

CIA and Graziadio proffer that they refused to allow Graziadio back to work

because of some alleged failure to provide adequate medical certification.  There is

ample evidence of pretext.

First, as shown above, this entire notion is improper as a matter of law

insofar as CIA and Garrioch failed to request said certification within the time

frame provided by the regulations and, additionally, such request was made by

Garrioch after CIA approved the leave for both Vincent and TJ.

Second, this entire notion is not true as a matter of fact.  As the record makes

clear, or at the very least as should be submitted to a jury, even if Garrioch and

Attorney Lynett were correct that Graziadio's "paperwork" was deficient (which they

were not under both the facts and the law), it is obvious that "had [Graziadio] been

given the opportunity to cure the deficiency, she could have shown that she was in fact

---

[19] To the extent the Court would consider whether Univ. of Texas v. Nassar, 133 S.Ct. 2517, 186
L.Ed.2d 503 (2013), should be applied in the FMLA retaliation context, such a jurisprudential
proposition should be rejected by the Court.  See Ion v. Chevron USA, Inc., 731 F.3d 379, 390
n.11 (5th Cir. 2013); see also Wanamaker v. Town of Westport Bd. of Educ., 11-cv-1791 (MPS),
2014 WL 1281937 (D.Conn. Mar. 27, 2014).  However, even under the Nassar standard, this
matter should proceed to a jury.  See Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 n.5 (2d Cir.
2013); Sass v. MTA Bus Co., 10-cv-4079 (MKB), 2014 WL 585418 (E.D.N.Y. Feb. 14, 2014)
(same); Kwan, 737 F.3d at 846 n.5; Balko v. Ukrainian Nat. Fed. Credit Union, 13-cv-1333
(LAK/AJP), 2014 WL 1377580 (S.D.N.Y. Mar. 28, 2014); Stoler v. Inst. for Integrative
Nutrition, 13-cv-1275, 2013 WL 6068598, at *12 (S.D.N.Y. Nov. 18, 2013).

. . . actually entitled to FMLA leave [and CIA's] failure to permit Graziadio a reasonable opportunity to cure the incomplete certification could be deemed to have resulted in the loss of FMLA leave to which [s]he was entitled." Parsons v. Principal Life Ins. Co., 686 F.Supp.2d 906, 916 (S.D. Iowa 2010) (citing authority).[20]

Third, to the extent the reason for Garrioch's refusal to return Graziadio to work was deficient paperwork, it was (at the time) deficient paperwork for the previously taken leave for Vincent. And while CIA and Garrioch are now apparently conceding that the paperwork was sufficient regarding Vincent, that they are abandoning that argument now is proof of pretext.

Fourth, this proffered excuse is untrue insofar as Garrioch actually refused to return Graziadio to work (as of July 12, 2012) not because Graziadio failed to produce sufficient paperwork regarding TJ's injury, but because Graziadio offered to meet "anytime, anywhere" that "might fit in with [Defendant Garrioch's] prescheduled meetings." A403-406 at ¶¶ 70-71, 73-75, 77-82; A483, A484, A490.

Fifth, CIA and Garrioch's violation of CIA's own policies (see A768-778 at ¶¶ 77, 81, 82-84, 89, 97, 105-108, 132, 133; A117 (reinstatement within two days)) constitutes proof of pretext. Weinstock v. Columbia Univ., 224 F.3d 33, 45 (2d

---

[20] In this regard, Garrioch's deposition testimony is compelling proof of pretext. During her deposition Garrioch explained what would constitute compliance with her demands, which is spot-on exactly what Graziadio did: "If she contacted us immediately, remedied paperwork items and gotten those things take care of, absolutely we could have worked on a return to work." A584.

49

Cir. 2000); <u>Becker v. Buffalo Public</u>, 2013 WL 904088 (W.D.N.Y. 2013); <u>cf.</u>

<u>Young v. Wackenhut Corp.</u>, 10-cv-2608 (DMC), 2013 WL 435971 (D.N.J. Feb. 1,

2013) (notice in a handbook insufficient).

Sixth, CIA (when FMLA leave is managed by the Payroll Department as it

should be) have routinely allowed employees back to work on intermittent leave

(even in the very specific instance of a child's broken leg) without any medical

certification required at all and prior to the submission of certification, including

returning Graziadio from her own personal leave, A503-505[21] at lines 4, 57, 83, 85,

and CIA routinely allowed employees extra time to provide a requested medical

certification, A550-551.  <u>See also</u> A503-505 at lines 1, 2, 5, 13, 17, 20, 22, 23, 25,

32, 36, 56, 61, 62, 637, 80, 89, 95 (employees allowed to return to work before

they have provided CIA with a requested medical certification); A503-505 at lines

19, 27, 31, 74, 76, 87, 94, 97, 103, 104 (employees allowed to return to work from

FMLA leave without providing any medical certification at all).

### 3.    <u>The Termination</u>

CIA and Garrioch ultimately rest their entire case on the notion that

termination was appropriate because, according to CIA, "it is obvious to [CIA] that

you do not want to return to work."  A497.  As shown above, the exact opposite is

true.  Graziadio desperately wanted to return to work -- as evidenced by her

---

[21] This exhibit, the "Disability Report," is explained by Maffia at A546 through A549.

repeated efforts beginning on July 12, 2012, and continuing with her attorney's efforts only hours after he was given the "heads up" email, A721, that "the CIA will administratively terminate [Graziadio's] employment . . .," id.[22]  To assert that Graziadio abandoned her position is beyond pretextual -- it is blatantly contrived.

### 4.  Additional Evidence of Pretext[23]

(a)  Garrioch's treatment of other employees.  The testimony of other employees about their treatment by a defendant is relevant to the issue of an employer's discriminatory intent.  Zubulake v. UBS Warburg LLC., 382 F.Supp.2d 536, 544 (S.D.N.Y. 2005) (citations and quotations omitted).  Here, there is ample testimony from other employees during the exact same time period that is directly on point.  See A527-542, A670-684, A778 at ¶ 134 (Mary Ann Stearns); A724-734 (Steven Botti); A735-755 (Casey Harvell) (FMLA violations as conclusively determined by U.S. DOL; note especially A739 at ¶ 19 (CIA caused the absences for which she was being disciplined)); see also A 778 at ¶ 132

---

[22] Attorney Lynett's 9:26 PM "heads up" email (A721) purports that the discharge had not yet occurred.  This is pretextual at best.  In fact, the discharge decision had been made earlier that day, and the discharge letter sent to Graziadio well before Attorney Lynett's feigned "heads up" notice to Attorney Ranni.

[23] With the exception of the unemployment compensation decision, discussed below, Judge Roman makes no reference to, nor discusses any of this evidence of pretext, instead concluding as fact-finder that "Plaintiff tries to create issues of fact concerning the basis for the termination decision, suggesting it was a decision made by Garrioch (the 'terminator'), who was fed up with Plaintiff's repeated requests for FMLA leave. But arguments concerning Garrioch's purportedly-ill motivation are speculative and not grounded in any affirmative evidence."  SA16.

(citing A521, A727 at ¶ 18, A730, to show that Garrioch routinely adds adverse job performance criticism while employees are out on FMLA leave).

        (b)    <u>The unemployment compensation decision</u>.  Not only was Graziadio granted unemployment insurance benefits in the face of CIA's substantive objection, <u>see</u> A607, CIA's same contentions made here were rejected with extreme prejudice.  A543 ("You discharged the claimant from her payroll specialist position via letter dated 9/11/12 for failing to contact her supervisor for a return to work date.  She provided multiple emails, requests for a meeting, requests for FMLA information with no response or inconclusive responses.  <u>Your claim she did not want to return is contrary to all information on file.  She did all she could to protect her job & was told she could not.</u>  This is not misconduct.").  While not dispositive, this determination is evidence of pretext.  <u>Altman v. Port Auth. of New York & New Jersey</u>, 879 F.Supp. 345, 349 (S.D.N.Y. 1995), <u>Fitch v. R.J. Reynolds Tobacco Co.</u>, 675 F.Supp. 133, 138 (S.D.N.Y. 1987).[24]

        (c)    <u>Defendants' shifting reasons</u>.  CIA's shifting reasons for the adverse employment actions against Graziadio are evidence of pretext.  <u>Weiss v. JPMorgan Chase & Co.</u>, 332 F.App'x 659, 663-64 (2d Cir. 2009).  As shown above, Garrioch at first refused to return Graziadio to work because of insufficient

---

[24] Judge Roman engages in fact-finding on this question, remarkably determining that he (sitting as jury) would not give the unemployment compensation decision any credence.  SA17 at n.4.

52

paperwork regarding the previously taken leave for Vincent. After the litigation was commenced, CIA took the new argument that this paperwork was on the wrong form. A764 at ¶ 53. Next, CIA contends that it never was about the leave for Vincent, and what it was really all about was the improper undefined "paperwork" for TJ. Next, CIA contends that they would take Graziadio back to work, but only after a face-to-face meeting. Next, CIA contends that they were refusing to return Graziadio to work because she said she would meet "anytime, anywhere" rather than identify a specific day and time. Next, CIA contends inexplicably reversing course[25] that Graziadio can come back to work, she just has to contact her supervisor within some undefined period of time. Next, CIA imposes (without telling anyone) an arbitrary time frame of seven business days within which Graziadio had to contact her supervisor and use that failure to justify Graziadio's discharge. These shifting and moving goal posts are evidence of pretext.

        (d)   <u>Evidence of CIA and Garrioch's animus</u>. CIA, under the tutelage of Garrioch, are notoriously hostile towards FMLA leave and in particular the very type of leave sought by Graziadio here. <u>See</u> A725 at ¶¶ 6-8 (Garrioch was

---

[25] As shown seriatim, there remains no explanation in the record for Garrioch's sudden decision in late August 2012 to take Graziadio back to work notwithstanding the previous months of argument that Garrioch would <u>not</u> take her back to work. The reasoning necessarily could not be because of the "paperwork," as CIA, Garrioch and Attorney Lynett continued to assert that the deficiencies remained uncured.

nicknamed "The Terminator" in regards to employees on FMLA leave.), A726 at ¶¶ 10-11, 14-15; A736 at ¶ 6; A392 at ¶ 27. Garrioch could not have been clearer that she was hostile towards Graziadio's need to care for her recently-diabetes-diagnosed son when she took the untenable position throughout these proceedings (at least until CIA's abrupt change of course) that Graziadio was asking for FMLA leave for every day for the rest of her life to care for her children. A775-776 at ¶ 114 (<u>citing</u> Garrioch testimony at A580 and A586-589); <u>see also</u> A574, A579, A583, A585-586, A590, A593, A594-596. Garrioch's animosity is highlighted by her unilateral and first-ever decision to not only veto the Payroll Department's approval of Graziadio's leave, but to assume exclusive control over the management of all communications regarding what Garrioch interpreted to be a seven-day a week lifetime request for leave.

> (e)     <u>Graziadio had a perfect employment record.</u>  Graziadio's exemplary employment record, A412-432, is evidence of pretext.  <u>See</u> <u>Nembhard v. Mem'l Sloan Kettering Cancer Ctr.</u>, 104 F.3d 353 (2d Cir. 1996) (The evidence of pretext, and [protected-status]-related statements used to support [Graziadio's] prima facie case, together with the harsh treatment of a veteran employee with a near-unblemished employment record, supports the conclusion that discrimination was the motivation behind her termination.").

54

(f)    Defendants planned on replacing Graziadio.  As explained by declarant Botti, who had a front row seat to all of these events, once Graziadio revealed her son's diagnosis with juvenile onset diabetes, CIA and Garrioch communicated by their actions and their statements that they expected Graziadio would never be returned to her position and CIA and Garrioch took steps to secure Graziadio's replacement even before she was terminated from employment.  A726 at ¶¶ 9-12, 14-15.  This is consistent with other conduct by CIA which evidences the same intention.  See A777 at ¶ 130 (citing A581-582), A778 at ¶ 133 (citing A522-523, A80-85 (cutting off Graziadio's computer access while Graziadio was on FMLA leave in violation of the CIA Handbook), A779 at ¶ 135 (citing A506-510), A407 at ¶ 85 & A494 (Maffia to Graziadio on August 7, 2012:  "So, you are trying to come back?").

(g)    It was all approved leave.  That CIA and Garrioch's articulated non-discriminatory reason is pretextual is underscored by the incontrovertible fact that both the leave associated with Vincent and TJ were approved leaves, at least until Garrioch assumed exclusive control and vetoed what the Payroll Department had resolved.

## V.    DEFENDANT GARRIOCH IS AN "EMPLOYER" UNDER THE ACT

There is ample evidence that Garrioch falls under 29 C.F.R. § 825.104(a)'s prescription that any person "acting, directly or indirectly, in the interest of a

covered employer to any of the employees of the employer" is an employer.  That

Mr. Mignault had to approve the discharge decision is irrelevant and a ruse given

his total non-participation in the decision.  A642-644, A647, A654-655 (Mignault);

cf. A608-609 (claiming Mignault was in the loop, but conceding it was her

decision to fire Graziadio).  Judge Roman's fact-finding otherwise, should be

reversed.

## VI.  GRAZIADIO'S ADA CLAIMS SHOULD PROCEED TO THE JURY

An ADA "association discrimination" claim under 42 U.S.C. § 12112(b)(4)

is subject to the shifting burdens standard under McDonnell Douglas, supra.

Abdel-Khalek v. Ernst & Young, L.L.P., 97-cv-4514 (JGK), 1999 WL 190790

(S.D.N.Y. Apr. 7, 1999).  As shown above, Graziadio has offered evidence for all

four of the elements of a prima facie case:  (i) Graziadio was qualified for the job;

(ii) Graziadio was subjected to adverse employment action; (iii) Graziadio was

known by her employer at the time to have a relative or associate with a disability;

and (iv) the adverse employment action occurred under circumstances raising a

reasonable inference that the disability of the relative or associate was a

determining factor in the employer's decision.  Id. (citing Den Hartog v. Wasatch

Academy, 129 F.3d 1076, 1085 (10th Cir.1997)).  As to the fourth prong, Courts in

this District have drawn guidance from Larimer v. Int'l Bus. Machines Corp., 370

F.3d 698 (7th Cir.2004), which identifies three types of situations which could fall

within the "associational discrimination provision of the ADA: expense, disability by association, and distraction." Dessources v. American Conference Institute, 2013 WL 2099251, *3 (S.D.N.Y. 2013). This third situation -- distraction -- involves circumstances where an employer may be concerned that "the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention." Larimer, 370 F.3d at 700.

Here, Graziadio has ample evidence to satisfy this "minimal," Pellegrino, 313 F.Supp.2d at 315 (citing cases), burden at the prima facie stage. Graziadio has shown significant temporal proximity given Garrioch's state of mind in July 2012, and this coupled with the ample evidence that Garrioch was concerned with the very "distraction" cited in Larimer, supra, see A775-776 at ¶ 114 (citing Garrioch testimony at A580 and A586-589); see also A574, A579, A583, A580, A585-590, A593-596 (Garrioch); A725-726 at ¶¶ 6-15 (Botti); A736 at ¶ 6 (Harvell); A392 at ¶ 27, is sufficient to shift the burden to CIA and Garrioch.

As shown above, there is more than ample evidence that CIA and Garrioch's articulated non-discriminatory reasons for the series of adverse employment actions are pretextual.

## **CONCLUSION**

For these reasons, as well as the entire record before the Court, it is

respectfully submitted that Judge Roman's decision granting summary judgment on

all claims should be reversed and this matter remitted to the fact finder for trial on

the merits.

Dated:      Rhinebeck, New York
            July 7, 2015

 

Nathaniel K. Charny (NC5664)
Charny & Associates
9 West Market Street
Rhinebeck, New York  12572
Tel - (845) 876-7500
Fax - (845) 876-7501
ncharny@charnyandassociates.com

Attorneys for Cathleen Graziadio

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                :

CATHLEEN GRAZIADIO,                 :

                                :

                       Plaintiff,      :       13-cv-1082 (NSR)

       -against-                          :       OPINION AND ORDER

                                :

CULINARY INSTITUTE OF AMERICA,    :
SHAYNAN GARRIOCH, and          :
LOREEN GARDELLA,                  :

                                :

                      Defendants.     :
------------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

       Plaintiff Cathleen Graziadio ("Plaintiff") commenced this action by complaint filed

February 15, 2013 and amended April 22, 2013, against Defendants Culinary Institute of

America ("CIA"), Shaynan Garrioch ("Garrioch"), and Loreen Gardella ("Gardella")

(collectively, "Defendants"). The amended complaint (dkt. no. 14) seeks damages and other

relief for interference and retaliation under the Family Medical Leave Act of 1993 ("FMLA"), 29

U.S.C. § 2601 *et seq.* (claims one and two), for associational discrimination under the Americans

with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* (claim three), and for

associational discrimination under the New York Human Rights Law, N.Y. Exec. Law §§ 292

and 296 *et seq.* (claim four).

       By letter dated January 14, 2014, Plaintiff withdrew her claim under the New York

Human Rights Law. Defendants now move for summary judgment on the remaining three

claims pursuant to Federal Rule of Civil Procedure 56. Defendants' motion is GRANTED for

the reasons outlined below.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/20/2015

1

I.   **FACTS**

The facts are gleaned from the parties' Rule 56.1 statements, declarations, and exhibits, and are not in dispute, except where so noted.  CIA is the oldest culinary college in the United States, with a primary campus located in Hyde Park, New York.  *See* Affirmation of Joseph J. Lynett ("Lynett Aff.") Ex. A ¶ 2.  Garrioch has been employed by CIA since January 6, 2011, first as Director of Human Resources—Administration, and then as Direct of Human Resources. *Id.* Ex. B. at 5.  Gardella has been employed as CIA's payroll manager since May 2007.  *Id.* Ex. C at 6.  Non-party Richard Mignault ("Mignault") is CIA's Vice President—Administration and Shared Services.  *Id.* Ex. D at 6.  Mignault had final decision-making authority for CIA's employment termination decisions.  *Id.* at 23.

CIA maintains an employee handbook and policy governing employees' entitlement to leave under the FMLA and the administration thereof.  *Id.* Ex. A at 44-47.  The policy provides that a qualifying employee is "eligible to take a family care or medical leave of up to a maximum of 12 work weeks in any 12-month period" to handle health issues pertaining to the employee or her children.  *Id.* at 44.  The policy also requires that an employee requesting leave provide CIA "appropriate medical certification" from a health care provider within fifteen days of an unanticipated leave request, if practicable.  *Id.* at 45.

CIA hired Plaintiff on April 17, 2007, to work as a Payroll Administrator—Student Payroll.  *Id.* Ex. E at 53, Ex. F.  Upon her hire, Plaintiff received a copy of the employee handbook containing CIA's FMLA policy.  *Id.* Ex. G, H.  Plaintiff reported directly to Gardella while with CIA.  *Id.* Ex. E at 61.

In March 2012, Plaintiff requested and received FMLA leave on account of a work-related injury.  *Id.* at 67-69, 71.  Plaintiff returned to work thereafter.  *Id.*

**A.  Leave Requested for Vincent Graziadio**

On June 6, 2012, one of Plaintiff's two sons, Vincent Graziadio ("Vincent") was

hospitalized for diabetes-related illness.  *Id.* at 72.  Plaintiff again took leave, and, on June 7,

2012, received from CIA the United States Department of Labor's FMLA Designation Notice,

Notice of Eligibility and Right and Responsibilities, and a Medical Certification form.  *Id.* at 75-

77.  Plaintiff concedes that she received these materials.  *Id.* at 76.  The notices and form stated

that, upon request, an employee must provide a certification to support the need for FMLA leave.

*Id.* Ex. M.

Plaintiff was on leave from the date of Vincent's hospitalization, June 6, 2012, until her

return to work on June 18, 2012.  After her return, on or about June 27, 2012, she provided CIA

a medical certification supporting that leave.  *Id.* Ex. E at 78-80, Ex. M.  The certification she

provided also indicated that future intermittent leave to care for Vincent would be needed, and

estimated the term of care as "7 days per week from now through lifetime."  *Id.* Ex. M.  The

parties agree, however, that Plaintiff did not request any further leave to care for Vincent

thereafter.[1]  *Id.* Ex. E at 80.  Regarding the leave already taken for Vincent, CIA never expressly

approved it as FMLA leave, but the company counted the days taken against Plaintiff's annual

FMLA leave allotment and communicated the same to Plaintiff, thus impliedly approving it, at

least in the first instance.  *See id.* Ex. T.

**B.  Leave Requested for T.J. Graziadio**

On June 27, 2012, Plaintiff's other son, T.J. Graziadio ("T.J.") reportedly fractured his

leg, and that same day, Plaintiff told Gardella that Plaintiff would not be returning to work for

---

[1] In a declaration submitted with opposition briefing, Plaintiff states that she took approximately five hours' leave to care for Vincent the week she returned in June 2012, although this assertion is inconsistent with her deposition testimony, and, in any event, is not of great moment for reasons discussed below.

3

the remainder of the week.  *See id.* Ex. N, O.  The following week, on July 2, 2012, Plaintiff told

Gardella she would not be in for the remainder of that week either, on account of T.J.'s injury,

and referenced FMLA documentation Plaintiff had left in her desk drawer.  *Id.* Ex. Q.  Gardella

responded on July 5, 2012 by confirming receipt of the documentation, which pertained to the

earlier leave taken for Vincent's illness, and told Plaintiff she had 196.75 hours of FMLA time

remaining.  *Id.* Ex. T.

Expecting Plaintiff to return to work on July 9, 2012, when she did not do so, Gardella

emailed Plaintiff asking for an update.  *Id.* Ex. U.  Early evening on July 9, 2012, Plaintiff

emailed Gardella and requested permission to return to work on a part-time basis, three days per

week, until August 2012 or so.  *Id.* Ex. V.  In the meantime, CIA had approved the hire of a

temporary employee to replace Plaintiff.  *Id.* Ex. S.

Thereafter, while Plaintiff remained absent, Gardella consulted with colleagues and

referred the matter to Garrioch.  On July 17, 2012, Garrioch sent Plaintiff a letter taking issue

with the documentation (or lack thereof) supporting:  (a) the prior request for prospective

intermittent leave for Vincent; and (b) the more recent leave for T.J.  *Id.* Ex. Y.  Garrioch

requested that Plaintiff provide supplemental documentation supporting both leave requests

within seven days, and Garrioch warned of potential employment action absent receipt of such

documentation.  *Id.*  In response to Garrioch's letter, Plaintiff sent a series of emails indicating

confusion with the request for further documentation.  *See* Ex. Z.  In a July 19, 2012 email,

Plaintiff said she intended to return to work on July 24, 2012 under her proposed, modified work

schedule of three days per week.  *Id.*

On July 20, 2012, Garrioch emailed Plaintiff a Department of Labor informational

brochure and an explanation of the deficiencies in Plaintiff's documentation.  *Id.* Ex. AA ("For

the documentation you have provided [concerning future intermittent leave for Vincent], it does not include the estimate of how much time you will need for each absence, how often you will be absent, and information establishing the medical necessary [sic] for taking such intermittent leave.").  On or about July 23, 2012, Plaintiff submitted a second medical certification, signed by a health care provider, further explaining the potential need for future intermittent leave for Vincent, and a medical note regarding T.J.'s injury.  *Id.* Ex. E at 125, Ex. BB, CC.  The note regarding T.J. was scant of detail—it requested that Plaintiff be allowed to work three days a week for the following two weeks, but it did not certify the need for Plaintiff's prior absence for T.J., which began on June 27, 2012, and it did not say the proposed three-day schedule was medically necessary either.  *Id.* Ex. CC.

On July 23, 2012, Garrioch advised Plaintiff that the documentation provided was inadequate to support the leave taken for T.J., or to support the request to work part-time.  *Id.* Ex. EE.  Garrioch proposed a meeting to resolve outstanding issues and requested that Plaintiff propose three dates and times.  *Id.*  A series of emails ensued, in which Garrioch reiterated the request for Plaintiff to propose dates and times to meet.  *Id.* Ex. FF.  Plaintiff provided none, but rather, responded that she was available to meet "any time." *Id.*  Ultimately, on August 1, 2012, Plaintiff requested that she be allowed to return to work full time, but Garrioch said a meeting was required since Plaintiff's absences had not been authorized.  *Id.*

On August 7, 2012, CIA received a letter from Plaintiff's counsel, Joseph J. Ranni ("Ranni"), requesting that Plaintiff be allowed to return to work and representing that Plaintiff would provide any necessary documentation.  *Id.* Ex. GG.  CIA's attorney, Joseph J. Lynett ("Lynett"), responded to Ranni by email on August 30, 2012, and advised that "if Plaintiff wants to return to work . . . she must contact her supervisor to arrange for her return to work."  *Id.* Ex.

HH.  Lynett also said Plaintiff needed to "provide two sufficient and complete FMLA medical certification forms," instead of the documentation previously provided.  *Id.*  On August 30, 2012, the email from Lynett to Ranni was forwarded directly to Plaintiff.  *Id.*

Thereafter, Plaintiff did not contact her supervisor to arrange for her return to work.  *Id.* Ex. E at 212.  Plaintiff concedes this, although she argues the lack of contact was because she was dealing with CIA attorney-to-attorney by then.  *Id.*  Two weeks passed following Lynett's directive that Plaintiff should provide complete certifications and contact CIA to arrange a return to work, at which point Mignault approved CIA's decision to terminate Plaintiff's employment. Garrioch notified Plaintiff of that decision by letter dated September 11, 2012.  *Id.* Ex. II.  The stated basis for the termination decision was that Plaintiff "had not contacted [her] supervisor to arrange to return to work," thus demonstrating a desire not actually to return to work (while saying otherwise) and instead to negotiate a severance package to which she was not entitled.  *Id.*

## II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 states, in pertinent part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party also may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party, which must identify "specific facts showing that there is a

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 244 (S.D.N.Y. 2001).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

### A. FMLA Claims

As a threshold matter, Defendants argue that neither Gardella nor Garrioch qualifies as Plaintiff's "employer" within the meaning of the FMLA. "A person can face individual liability under the FMLA only if that person is an 'employer.'" *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365 (S.D.N.Y. 2012). Such person can include "any person who acts directly or indirectly in the interest of an employer to any of the employer's employees." *Id.* (quoting 29 C.F.R. § 825.104(d)). Courts employ an "economic reality" test to determine

whether an individual qualifies as a person acting "in the interest" of an employer, considering

whether the alleged employer "'(1) had the power to hire and fire the employees, (2) supervised

and controlled employee work schedules or conditions of employment, (3) determined the rate

and method of payment, and (4) maintained employment records.'" *Id.* (quoting *Herman v. RSR*

*Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).

      In briefing, Plaintiff concedes that Gardella is not an employer within the meaning of the

FMLA.  As such, the Court grants Gardella's motion for summary judgment on the FMLA

interference and retaliation claims.  In contrast, Plaintiff argues that Garrioch is an employer and

that Mignault's ultimate discretion over employment termination decisions is not dispositive.

That is true.  The power to hire and fire employees is but one factor.  *Malena*, 886 F. Supp. 2d at

365.  But Plaintiff's assertion that Mignault's approval of Plaintiff's termination "is irrelevant

and a ruse given his total non-participation in the decision" is unsupported by record evidence.

Plaintiff cites deposition excerpts that are, at most, equivocal on the interplay between

Mignault's termination authority and Garrioch's participation in the termination decision, *see*

Declaration of Nathaniel K. Charney ("Charney Decl.") Ex. 15 at 26-28, 33, 46, 54, and Plaintiff

conveniently ignores the portion of Mignault's testimony where he confirmed that all termination

decisions eventually rested with him and that he did, therefore, participate in the decision, *see*

Lynett Aff. Ex. D at 23 (Q: "So your testimony is you were involved in the decision to terminate

. . .? A: "Yes."); *see also* Charney Decl. Ex. 13 ("That was a [termination] decision that was

made between myself and Richard Mignault.").

      Beyond that, Plaintiff has proffered no evidence, aside from Garrioch's title as director

of human resources, demonstrating that Garrioch supervised or controlled employee work

schedules or conditions of employment, determined the rate and method of employee payment,

or maintained employment records.  *Malena*, 886 F. Supp. 2d at 365.  Plaintiff having not done

so, testimony that termination authority rested with Mignault compels the conclusion that

Garrioch was not an employer under the economic reality test, thus barring any FMLA claim

against Garrioch.  *See Anderson*, 477 U.S. at 248 (onus shifts to non-moving party to

demonstrate genuine issue for trial, upon moving party fulfilling preliminary burden).  The Court

grants Garrioch's motion for summary judgment on the FMLA interference and retaliation

claims.

### 1.   Interference Claim Against CIA

As for CIA, the FMLA prohibits employers from interfering with their employees' ability

to take FMLA leave.  *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employee to

interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided

under this subchapter.").  Interfering with the exercise of an employee's rights includes not only

refusing to authorize FMLA leave, but discouraging an employee from using such leave.  29

C.F.R. § 825.220(b); *see also Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004).  An

employee may bring an interference claim against the employer when "the employer in some

manner impeded the employee's exercise of [the] right[s] afforded substantive protection under

the FMLA."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) (citation omitted).

To state a prima facie claim for interference under the FMLA, the plaintiff must allege that:  (1)

she is an eligible employee; (2) the defendant qualifies as an employer under the FMLA; (3) the

plaintiff was entitled to take leave under the FMLA; (4) the plaintiff gave notice to the defendant

of her intention to take leave; and (5) the defendant denied the plaintiff benefits to which she was

entitled under the FMLA.  *Brown v. The Pension Bds., United Church of Christ*, 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007).

The parties agree that elements one, two, and four of an FMLA interference claim against CIA are satisfied.  The dispute centers on elements three and five—whether Plaintiff was entitled to take leave, and whether CIA, through Garrioch, Gardella, or another employee, denied or discouraged leave to which Plaintiff was entitled by improperly obstructing her return to work.  CIA argues that it provided Plaintiff all benefits she was due, but Plaintiff challenges this.

Arguments concerning Plaintiff's diabetic son Vincent are largely a distraction.  Communication about the leave for Vincent was muddled, and perhaps for that reason, Garrioch incorrectly testified that CIA had not at least impliedly approved FMLA leave taken in June 2012 for Vincent's hospitalization.  Garrioch also thought that Plaintiff had not returned to work after the leave for Vincent, *see* Charney Decl. Ex. 13 at 93, which is incorrect.  Plaintiff returned to work on June 18, 2012.

Any dispute regarding leave for Vincent centers on the adequacy of the medical certification submitted on or about June 27, 2012, after Plaintiff returned to work and shortly before her absence for T.J.  *See* Charney Decl. Ex. 13 at 107.  The certification included an indefinite, prospective request for intermittent FMLA leave for the remainder of Vincent's lifetime.  *See* Lynett Aff. Ex. M.  When Garrioch took control of the communication, she concluded that the June 27, 2012 medical certification did not adequately support the request for *future* leave.  This conclusion was somewhat obvious since the request was totally vague, prospective, and indefinite, to the point where no employer reasonably would have approved it.  Garrioch communicated that to Plaintiff, albeit in July 2012, after Plaintiff had taken additional leave for T.J. which prompted CIA's scrutiny of the documentation.  *See* Lynett Aff. Ex. Y.  Any

10

subsequent dispute regarding the adequacy of support for future leave for Vincent is largely irrelevant, however, because Plaintiff never attempted to draw down on that prospective leave request[2] and because the absence of documentation supporting leave taken for T.J. drove the conversation thereafter. Because she never actually sought to take additional leave for Vincent, and because discussions concerning leave for T.J. superseded those for Vincent, it is difficult to see how CIA could have interfered with Plaintiff's alleged right to future leave for Vincent.

The interference claim, rather, is based principally on the dialogue that took place after June 27, 2012, while Plaintiff was on leave attending to T.J., pertaining to the leave taken for T.J.'s injury. It is undisputed that Plaintiff notified Gardella on June 27 that Plaintiff could not return to work for at least the remainder of the week. Lynett Aff. Ex. N, O. At that time, Plaintiff had received an FMLA Notice of Eligibility and Rights and Responsibilities (she received one pertaining to the leave for Vincent), and CIA was not required to provide another notice. 29 C.F.R. § 825.300(b)(3) (one notice within a twelve-month period suffices). The notice stated that CIA could request a medical certification, *see* Lynett Aff. Ex. M, and CIA's employee handbook and FMLA policy confirmed the same, operated as a standing request for a certification, and gave Plaintiff fifteen days after any leave request to provide one if practicable, *id.* Ex. A at 45.

Confirming what the employee handbook required, CIA expressly requested a medical certification for the leave for T.J. on July 17, 2012, after the matter had been referred to Garrioch. *See* Lynett Aff. Ex. Y. CIA was entitled to assert its right to a certification, even though more than five days had passed since Plaintiff noticed the leave, because it became questionable that Plaintiff had taken nearly a month's full-time leave for a child's fractured leg.

---

[2] One possible exception to this is the five days Plaintiff argues she took for Vincent the week she returned to work in June 2012, but even if taken, approval or non-approval of those days is tangential to the merits.

*See* 29 C.F.R. § 825.305(b) (a request for medical certification generally must be made "at the time the employee gives notice of the need for leave or within five business days thereafter," but a request may be made "at some later date if the employer has reason to question the appropriateness of the leave or its duration").  The duration of Plaintiff's leave for T.J. justified the late request for a medical certification.[3]

When Plaintiff responded to Garrioch's July 17, 2012 letter with confusion, *id.* Ex. Z, Garrioch sent Plaintiff an informational brochure and a further explanation of the deficiencies in past documentation provided for Vincent (i.e., failure to note specific dates and times of future leave needed or why it was medically necessary), *id.* Ex. AA.  Thereafter, on July 23, 2012, Plaintiff submitted a supplemental certification concerning prospective leave for Vincent, *id.* Ex. BB, but she also submitted a patently inadequate note for T.J., which was silent with respect to the medical necessity of days already taken on T.J.'s account, *see id.* Ex. CC.  In other words, while demonstrating awareness of the certification requirement and the ability to provide more detailed information for Vincent, Plaintiff failed to do so for T.J.  This failure rendered the leave for T.J. unauthorized and stripped Plaintiff of any entitlement to return to work, unless and until she cured the defect.  *See Porter v. Potter*, No. 07-cv-124, 2010 U.S. Dist. LEXIS 145243, at *25 (E.D.N.Y. Jan. 20, 2010) (failure to submit supplemental medical documentation supporting leave requests despite opportunities to do so warrants denial of leave); *cf. Nichik v. New York City Transit Auth.*, No. 10-cv-5260, 2013 U.S. Dist. LEXIS 4692, at *36 (E.D.N.Y. Jan. 11,

---

[3] Plaintiff contends that before Garrioch took control of communication, CIA's payroll department had approved the leave for T.J., as demonstrated by an email response wishing Plaintiff "all the best" and by Excel spreadsheet coding applied by the payroll department which supposedly indicated that certain days in late June and July were, in fact, FMLA leave.  *See* Opposition Memorandum at 4.  The Court does not agree, however, that this leave conclusively was approved.  The "all the best" email was a mere pleasantry by any measure, and the payroll department's classification on the spreadsheets was a "first instance" determination.  *See* Charney Decl. Ex. 13 at 56-57.  Further, even if CIA had approved FMLA leave for certain days, the ever-extending duration of the leave made it reasonable and legal for CIA belatedly to seek a medical certification, to retract the approval prospectively, and to take adverse action thereafter.  *See* 29 C.F.R. § 825.305(b).

2013) ("defendants were entitled to request medical certification and delay restoring him to his position until it was provided") (citing 29 C.F.R. §§ 825.312(e), 825.313(d) (regarding fitness-for-duty certifications)); *Powell v. Metro One Loss Prevention Servs. Group, Inc.*, No. 12-cv-4221, 2013 U.S. Dist. LEXIS 111601, at *36 n.8 (S.D.N.Y. July 26, 2013) (same).

 Plaintiff concedes that when CIA received the note for T.J., Garrioch immediately told Plaintiff it was defective. *See* Declaration of Cathleen Graziadio ("Graziadio Decl.") Ex. 32 ("[I]t says that the minor child can return to school. It does not state that there was any medical necessity for you to provide full time care."). And yet Plaintiff did not cure the defect. Understandably, in light of disjointed email traffic, Garrioch proposed an in-person meeting and expressly asked Plaintiff to provide three time slots. *Id.* There is nothing nefarious about Garrioch's request for an in-person meeting where email communication had failed. Although Plaintiff stated a willingness to meet, she did not provide any time slots, which was a seemingly noncontroversial task. On August 7, 2012, more than fifteen days after the July 17, 2012 request for documentation (and after Garrioch's July 20, 2012 follow-up with a brochure and explanation of deficiencies), Plaintiff's counsel, Ranni, stating a willingness to provide what documentation was required. Even through counsel, who presumably reviewed the note Plaintiff had submitted concerning T.J. and the email correspondence explaining why it was defective, Plaintiff did not provide further documentation on August 7.

 On August 30, 2012, then more than a month after the original request for documentation, CIA's counsel, Lynett, gave what probably was the clearest directive to date: "provide two sufficient and complete FMLA medical certification forms" and have Plaintiff "contact her supervisor to arrange for her return to work." *Id.* Ex. GG. Inexplicably, Plaintiff and her counsel did neither. CIA was thus left with the aforementioned, skeletal note pertaining

to T.J.'s absence, which did not link days spent out of the office for T.J. with medical necessity. It may be that Plaintiff's counsel, Ranni, believed the default fifteen-day response period and any other stated deadlines were tolled by ongoing attorney-to-attorney discussions. *See* Opp. Mem. at 16 ("the notion of a return to work was on hold"). If he did, that belief was legally unfounded, as he made no attempt to memorialize an informal or formal tolling agreement which might have forestalled the adverse employment action of which Garrioch had warned one month earlier. CIA waited two additional weeks following the August 30, 2012 letter from Lynett to Ranni, a copy of which Plaintiff received. Despite the clear directive in that letter and in prior emails, Plaintiff did not provide supplemental documentation concerning T.J. and did not contact CIA to arrange a return to work.

On the evidence submitted, the Court finds no genuine issue of material fact concerning Plaintiff's failure to provide requested documentation pertaining to leave taken for T.J. or to follow stated protocol for arranging a return to work after the absence for T.J. Because Plaintiff failed to provide the requested documentation, CIA acted in accordance with the FMLA and with CIA's employee handbook in designating Plaintiff's continued absence unauthorized. Because the leave properly was so designated, a claim for interference by impeding reinstatement of employment does not lie. Plaintiff's failure to contact CIA in August 2012 to arrange a return to work further supports this conclusion. The Court therefore grants CIA's motion for summary judgment on the FMLA interference claim.

### 2. Retaliation Claim Against CIA

The above analysis applies with equal force to the FMLA retaliation claim against CIA. This claim too is grounded in the notion that CIA impeded Plaintiff's reinstatement of

14

employment and then terminated that employment based on her exercise of rights under the FMLA.

An FMLA retaliation claim invokes *McDonnell Douglas* burden-shifting.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Plaintiff first must articulate a prima facie case of retaliation by demonstrating that:  (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  *Colon v. Fashion Inst. of Tech (State Univ. of N.Y.)*, No. 12-cv-7405, 2013 U.S. Dist. LEXIS 150268, at *15-17 (S.D.N.Y. Oct. 18, 2013).  If Plaintiff does so, the burden shifts to CIA to articulate a non-retaliatory basis for the adverse employment action.  *Esser v. Rainbow Adver. Sales Corp.*, 448 F. Supp. 2d 574, 581 (S.D.N.Y. 2006) (citing *Quarantino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995)).  If CIA does so, Plaintiff must establish that the stated basis for the action is a mere pretext.  *Id.*

Undisputed facts undercut Plaintiff's retaliation claim.  The claim requires that a well-founded request for FMLA leave resulted in some adverse employment action, namely, the termination of Plaintiff's employment.  Plaintiff concedes that she took leave in March 2012 for her own work-related injury and then in early-June 2012 for Vincent's hospitalization.  Despite Garrioch's incorrect testimony to the contrary, CIA approved both instances of leave, at least impliedly.  Plaintiff returned to work after both of those instances without incident, and mere proximity between the exercises of leave rights and the ensuing events is of limited relevance. *See O'Reilly v. Consol. Edison Co.*, 173 Fed. Appx. 20, 22 (2d Cir. 2006) (holding that temporal proximity between exercise of rights and termination of employment, although it may be sufficient to establish a prima facie case of retaliation, was not sufficient to establish pretext

overcoming evidence of a legitimate non-retaliatory basis for the adverse action) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)); *see also Ben-Levy v. Bloomberg*, 518 Fed. Appx. 17, 19 (2d Cir. 2013) (holding that two-day temporal proximity between employee's complaint about discrimination and removal of employee from an important project, while enough to support a prima facie case of retaliation, was insufficient to establish pretext).

When it comes to the ensuing events—that is, the dialogue and the decisions made regarding the request for future intermittent leave for Vincent and for leave for T.J.—the record demonstrates that the adverse action eventually taken was taken because of concerns regarding documentation and because of Plaintiff's inaction.  Plaintiff tries to create issues of fact concerning the basis for the termination decision, suggesting it was a decision made by Garrioch (the "terminator"), who was fed up with Plaintiff's repeated requests for FMLA leave.  But arguments concerning Garrioch's purportedly-ill motivation are speculative and not grounded in any affirmative evidence.  The email trail reveals, rather, that when consulted in July 2012, Garrioch noticed deficiencies in documentation concerning the leave requests.  She communicated her concerns to Plaintiff and provided Plaintiff more than one opportunity to cure the deficiencies.  There is no real dispute about this.  At most, Plaintiff contends Garrioch was unclear and obstructionist in so communicating, but the written record does not bear this out.

The medical note for T.J., for example, was totally silent regarding the medical necessity for days already taken to care for him, and Garrioch explained that to Plaintiff the very same day Plaintiff submitted the note.  *See* Graziadio Decl. Ex. 32.  Plaintiff, having by then submitted two relatively detailed certifications for Vincent, knew or should have known the note pertaining to T.J. was inadequate.  Even so, Garrioch communicated that to her, generally was responsive by email, and attempted to set up an in-person meeting when email traffic became dysfunctional.

Far from suggesting that the eventual termination decision was made with retaliatory intent, the
evidence demonstrates a good faith attempt on CIA's part to address defects in documentation
thus clearing a path to reinstate Plaintiff's employment.  Ultimately, Plaintiff and her counsel
stated a willingness to provide the missing documentation, and yet they never did so.  Instead
they attempted to negotiate a severance package to which Plaintiff was not entitled, while
additional weeks ticked by.  When, after a number of requests and directives, Plaintiff did not
provide the appropriate documentation and did not contact CIA to arrange a return to work, CIA
waited two weeks and then took adverse employment action.[4]

On the evidence presented, the Court finds no genuine issue of material fact concerning
CIA's intent or the basis for the adverse employment action.  Even assuming arguendo that
Plaintiff has put forth a prima facie case of retaliation, CIA has submitted evidence establishing
legitimate, non-discriminatory bases for terminating Plaintiff's employment:  deficiencies in
documentation supporting FMLA leave requests and leave taken; and a failure to contact CIA to
arrange a return to work.  *Cf. Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 731 (S.D.N.Y.
2012) (job abandonment precludes retaliation and discrimination claims under Title VII and the

---

[4] The Court notes that the New York State Department of Labor (the "DOL") determined on November 1, 2012—
albeit without holding an evidentiary hearing—that Plaintiff was eligible for unemployment benefits despite CIA's
assertion that she was terminated for cause and therefore was ineligible.  *See* Charney Decl. Ex. 11.  In a summary
order, presumably having reviewed evidence similar to what is before this Court, an unnamed labor services
representative at the DOL stated a view that Plaintiff "did all she could to protect her job and was told she could
not" do so.  *Id.*  Judges in this district previously have admitted such DOL findings at jury trials in employment
discrimination cases and have afforded the findings weight on summary judgment.  *See, e.g., Altman v. Port Auth. of
New York & New Jersey*, 879 F. Supp. 345, 349 (S.D.N.Y. 1995); *Fitch v. R.J. Reynolds Tobacco Co.*, 675 F. Supp.
133, 138 (S.D.N.Y. 1987).  Here, however, the Court does not agree with the DOL's conclusion that the file
demonstrates an unequivocal desire and steps taken to return to work.  Rather, the file unequivocally demonstrates a
desire to return to work on Plaintiff's own terms (part-time), without providing sufficient medical certifications, and
only if Plaintiff's counsel could not negotiate an adequate severance package.  Further, the issue before the DOL
was whether there was cause (i.e., misconduct) to terminate Plaintiff's employment, not whether the asserted failure
to provide medical certifications and to arrange a return to work were pretext for FMLA-based retaliation or
disability-based discrimination.  That distinction lessens the import of the DOL finding.  *See Gore v. R.H. Macy &
Co.*, No. 86-cv-9684, 1989 U.S. Dist. LEXIS 6578, at *7-8 (S.D.N.Y. June 13, 1989).  On the whole, the finding
does not disturb this Court's conclusion that the record lacks evidence raising a material factual issue concerning
retaliatory or discriminatory intent.

ADA); *see also Brown v. The Pension Bds.*, 488 F. Supp. 2d at 403 ("Certainly, an employer is entitled to discharge an employee who fails to follow company rules and fails to appear for work without notification, even if the absences are attributable to a medical problem.").  There is insufficient evidence suggesting that these bases for termination were mere pretexts.  Accordingly, the Court grants CIA's motion for summary judgment on the FMLA retaliation claim.

### B. ADA Claim

Finally, Plaintiff's ADA claim based on associational discrimination also does not raise material factual issues warranting a trial.  The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b).  This claim, like the FMLA retaliation claim, is subject to *McDonnell Douglas* burden shifting.  *Moscarello v. Malcom Pirnie, Inc.*, No. 06-cv-5250, 2008 U.S. Dist. LEXIS 109002, at *10 (S.D.N.Y. Feb. 17, 2008).  To state a prima facie case, Plaintiff must prove that (1) she was qualified for the job at the time of the adverse employment action, (2) she was subjected to an adverse employment action, (3) she was known at the time to associate with someone with a disability, and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.  *Id.* at *10-11.  Plaintiff, moreover, must offer evidence that CIA was concerned about (a) the expense the disability would cause, (b) the possibility that the employee would become disabled in the future through the association, or (c) the possibility that that the

18

employee would be distracted by the disability. *See Dessources v. American Conference Inst.*, No. 12-cv-8105, 2013 U.S. Dist. LEXIS 69406, at *6-7 (S.D.N.Y. May 14, 2013).

As a threshold matter, associational discrimination based on a child's disability requires a legally cognizable disability. The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). This definition does not encompass T.J.'s temporarily fractured leg, and Plaintiff has submitted no authority to the contrary. Rather, the only potential disability is Vincent's diabetes, and the only possible discrimination theory is that CIA terminated Plaintiff out of concern that the diabetes would distract her. Undisputed evidence undercuts this theory, however. As noted above, temporal proximity between Vincent's diagnosis and Plaintiff's termination, although it may support a prima facie case, is not sufficient evidence of pretext. *O'Reilly*, 173 Fed. Appx. at 22; *Ben-Levy*, 518 Fed. Appx. At 19. Moreover, CIA reinstated Plaintiff's employment on June 18, 2012 – after learning of Vincent's diabetes – and expressed a desire to get her back into the office quickly while approving the hire of a mere temporary employee to replace her when she took leave for T.J. *See* Lynett Aff. Ex. S, X. The reinstatement, the attempt to get her back into the office, and the search for a temporary replacement undercut the notion that the diabetes was a determining factor in CIA's subsequent decision to terminate Plaintiff's employment.

The record demonstrates, rather, that when Plaintiff repeatedly extended her absence to care for T.J. and then requested a part-time return, Garrioch and CIA scrutinized the medical documentation and concluded that it did not support the leave taken for T.J. or the earlier request for future intermittent leave for Vincent. Garrioch communicated that to Plaintiff, but Plaintiff and her counsel did not timely cure the problem, and ultimately Plaintiff did not contact CIA to arrange a return to work. As above for the FMLA claims, the evidence does not raise genuine

issues of material fact concerning associational discriminatory motivation.  Even assuming arguendo that Plaintiff has stated a prima facie case, there is insufficient evidence of pretext overriding the proof of legitimate bases for Plaintiff's termination.  Accordingly, the Court grants Gardella, Garrioch, and CIA's motion for summary judgment on the ADA claim.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED in its entirety.  The Clerk of Court is respectfully requested to terminate the action.


Dated:    March 20, 2015            SO ORDERED:
          White Plains, New York

                                   _____
                                   NELSON S. ROMÁN
                                   United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
CATHLEEN GRAZIADIO,

|                                        |                                    |
|----------------------------------------|------------------------------------|
| Plaintiff,                             | 13 **CIVIL** 1082 (NSR)             |
| -against-                              | **JUDGMENT**                       |

CULINARY INSTITUTE OF AMERICA,
SHAYNAN GARRIOCH and
LOREEN GARDELLA,

Defendants.
------------------------------------------------------------X

Defendants having moved for summary judgment (Doc. #25) on May 22, 2014, and the matter having

come before the Honorable Nelson S. Román, United States District Judge, and the Court, thereafter, on

March 20, 2015, having handed down its Opinion and Order granting Defendants' Motion for summary

judgment in its entirety, it is,

**ORDERED, ADJUDGED AND DECREED:**   That for the reasons stated in the Court's

Opinion and Order, dated March 20, 2015, Defendants' Motion for summary judgment is granted in its

entirety; accordingly, the case is closed.

**Dated:** White Plains, New York
    March 23, 2015

CLERK

_____
**RUBY J. KRAJICK**
**Clerk of Court**

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   [✔] this brief contains 13,985 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), **or**

   [ ] this brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✔] this brief has been prepared in a proportionally spaced typeface using [Microsoft Word 2013                    ] in [Times New Roman Font Size 14        ], **or**

   [ ] this brief has been prepared in a monospaced typeface using [                                    ] with [                                    ].

(s) _____Nathaniel K Charny_____

Attorney for __Plaintiff-Appellant Cathleen Graziadio__

Dated: __July 7, 2015__