# 15-888

IN THE

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

CATHLEEN GRAZIADIO,

*Plaintiff-Appellant,*

v.

CULINARY INSTITUTE OF AMERICA, SHAYNAN GARRIOCH, in her individual capacity, and LOREEN GARDELLA, in her individual capacity,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## PLAINTIFF-APPELLANT'S  REPLY BRIEF

Dated:  Rhinebeck, New York
October 19, 2015

Nathaniel K. Charny
Charny & Associates
9 West Market Street
Rhinebeck, New York  12572
845-876-7500

Attorneys for Plaintiff-Appellant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION ..................................................................................1

REPLY TO POINT I
THE FACT FINDER SHOULD DETERMINE
WHETHER GARRIOCH WAS AN EMPLOYER
UNDER THE FMLA ..............................................................................1

REPLY TO POINT II
GRAZIADIO'S INTERFERENCE CLAIM
SHOULD PROCEED TO THE FACT FINDER .......................................4

    A. CIA and Garrioch Interfered with Graziadio's
    FMLA Rights Regarding Leave for Vincent .........................................4

        1.  Garrioch's interference was almost exclusively
           regarding the FMLA leave for Vincent .......................................5

        2.  Graziadio repeatedly requested and was
           denied intermittent leave to care for Vincent..............................8

        3.  CIA's evidence to the contrary is frivolous at best ......................11

    B. There is More Than Ample Evidence
    that CIA Interfered with Graziadio's
    FMLA Rights as it Regards the Leave for TJ .......................................16

        1.  Garrioch interfered with approved leave .....................................16

        2.  There was never a timely request for medical certification..........17

        3.  Even if there was a timely request,
           the alleged deficiencies were both not
           credible and not presented properly..............................................19

4.  There is no evidence to contradict the fact
    that Garrioch ceased all forms of communication
    with Graziadio ...............................................................21

5.  Graziadio's request to return without
    future leave is relevant ...................................................22

6.  Attorney Lynett and Garrioch worked
    together to continue the interference and
    retaliation against Graziadio .........................................22

REPLY TO POINT III
GRAZIADIO'S FMLA RETALIATION
CLAIM SHOULD PROCEED TO THE FACTFINDER ................................23

A. Introduction ...........................................................................23

B. Vincent's Leave Was the Reason Garrioch
   Refused to Allow Graziadio to Return to Work.....................25

C. There is Overwhelming Evidence of Pretext .........................25

1.  Introduction.................................................................26

2.  There Was No Clear Instruction to Contact her Supervisor.........27

3.  CIA's Brief is More Proof of Shifting Reasons ...........................27

4.  The similarly situated employee evidence is on point.................29

5.  The unemployment compensation decision is relevant...............29

6.  Graziadio's stellar employment record is relevant.......................30

7.  CIA planned on replacing Graziadio ............................................30

ii

REPLY TO POINT IV
GRAZIADIO'S ASSOCIATIONAL DISABILITY
DISCRIMINATION CLAIM SHOULD PROCEED
TO THE FACT FINDER.............................................................31

CONCLUSION ...........................................................................32

## TABLE OF AUTHORITIES

CASES

Brown v. Henderson, 257 F.3d 246 (2d Cir. 2001) ..................................12

City of New York v. Pullman Inc., 662 F.2d 910 (2d Cir. 1981)............................31

Ellis v. Century 21 Dep't Stores, 975 F. Supp. 2d 244 (E.D.N.Y. 2013) ...............32

Harcourt v. Cincinnati Bell Tel. Co., 383 F.Supp. 2d 944, 961 (S.D.Ohio 2005) ..18

Hayes v. New York City Dep't of Corr., 84 F.3d 614 (2d Cir. 1996) ....................13

Henderson v. Whirlpool Corp., 17 F.Supp.2d 1238, 1246-48 (N.D.Okla. 1998) ...18

Housel v. Rochester Inst. of Tech., 6 F. Supp. 3d 294 (W.D.N.Y. 2014) ................2

In re Fosamax Products Liab. Litig., 707 F.3d 189 (2d Cir.)
cert. denied sub nom. 133 S.Ct. 2783, 186 L.Ed. 2d 234 (2013) ............................13

Kennedy v. City of New York, 570 F.App'x 83 (2d Cir. 2014) ..............................13

Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106 (2d Cir. 1998.........13

Neidich v. Estate of Neidich, 222 F.Supp.2d 357 (S.D.N.Y. 2002)........................14

Palazzo v. Corio, 232 F.3d 38 (2d Cir. 2000)..........................................................14

Perry v. Jaguar of Troy, 353 F.3d 510, 514 (6th Cir. 2003)...................................18

Rule v. Brine, Inc., 85 F.3d 1002 (2d Cir. 1996)..................................................13,

White v. ABCO Engineering Corp., 221 F.3d 293 (2d Cir. 2000).........................14

Zubulake v. UBS Warburg LLC, 382 F.Supp.2d 536 (S.D.N.Y. 2005)................29

STATUTES/REGULATIONS

29 U.S.C.A. § 2613 ................................................................................19

29 C.F.R. § 825.300 ..............................................................................19

29 C.F.R. § 825.305 ..............................................................................18

29 C.F.R. § 825.306 ..............................................................................19

<u>INTRODUCTION</u>

In their principal brief (cited herein as CIA Brief), CIA and Garrioch offer no real evidence to create undisputed facts warranting dismissal. Instead, CIA and Garrioch rely upon post-hoc lawyers' arguments that in turn rely upon entirely manufactured undisputed "facts," that CIA and Garrioch contend, should keep Graziadio from having her day in Court.

As shown below and in Graziadio's principal brief (cited herein as Graziadio Brief), there are not only substantial facts in dispute, most of the facts supporting Graziadio's claims are undisputed.

Graziadio respectfully submits that a reasonable jury can find for Graziadio on all three of her claims against both defendants and summary dismissal of this matter should be reversed and the case remanded to be scheduled for trial.

<u>REPLY TO POINT I</u>

THE FACT FINDER SHOULD DETERMINE
<u>WHETHER GARRIOCH WAS AN EMPLOYER UNDER THE FMLA</u>

Judge Roman sitting as fact finder explains that while there is evidence to support Garrioch as employer under the FMLA, it should be disregarded as "equivocal."[1] SA8. In so doing, Judge Roman and now CIA and Garrioch in opposing this appeal, ask this Court to ignore the following at least "equivocal"

---

[1]Per Merriam-Webster: "Having two or more possible meanings."

1

evidence that Garrioch was for all purposes of this action an employer as defined by the FMLA.

(1)     Garrioch assumed exclusive and unilateral control over all personnel issues regarding Graziadio, including a blanket prohibition on anyone speaking with Graziadio except her.  Graziadio Brief, p. 21.

(2)     Garrioch had exclusive control over whether or not Graziadio would be allowed to return to work (and hence her schedule).  Graziadio Brief, pp. 20-24; see also A459, A468, A477.

(3)     Garrioch had exclusive control over Graziadio's FMLA rights in all regards.  Cf. Housel v. Rochester Inst. of Tech., 6 F. Supp. 3d 294, 316 (W.D.N.Y. 2014) (the question is whether the individual "controlled in whole or in part plaintiff's rights under the FMLA").

(4)     Garrioch testified at her deposition that she is nearly exclusively the "CIA" at least for purposes of dealing with Graziadio:

> A:     [W]e were asking for clarification from her physician in order to adequately review and make a decision in this matter.
>
> Q:     Who's the "we" in that answer?
>
> * * *
>
> A:     As I've stated before, the "we" is the CIA.  I reviewed everything in this matter with counsel,

>and I may have reviewed certain pieces of it with
>Richard Mignault.

A597; see also A587-588.

(5)     Garrioch testified at her deposition that the termination decision was a joint decision by her and Mignault and something that she put on the table (after consulting with Attorney Lynett).  A609.

(6)     Mignault had no role otherwise in anything regarding the adverse employment actions taken against Graziadio.  See A641-645, 648-650, 651-653. Mignault's lack of involvement is exemplified by his failure to conduct the obligatory investigation requested by Graziadio prior to her discharge.  Graziadio Brief, pp. 39-40.  And while it is true that Mignault stated at his deposition that "[a]ll decisions for termination eventually rest with me," SA8, this is contradicted not only by Garrioch's testimony above, but also by the next sentence, within which Mignault explains:  "So I would -- I would be informed or have authorized the termination," id. (emphasis added).

Hence, there is substantial evidence raising a question of fact as to whether or not Garrioch is an "employer" as defined by the FMLA.  Summary dismissal of same was improper.

REPLY TO POINT II

GRAZIADIO's INTERFERENCE CLAIM
SHOULD PROCEED TO THE FACT FINDER

A.     CIA and Garrioch Interfered with
       Graziadio's FMLA Rights Regarding Leave for Vincent

As shown in Graziadio's principal brief, Garrioch interfered with Graziadio's

FMLA rights as it regards to leave requirements for Vincent, both as to the

previously-taken leave and the requested future intermittent leave.  Graziadio

Brief, pp. 15-45.

In opposing the appeal on this point, CIA and Garrioch assert that because

Graziadio never requested any leave for Vincent after June 17, 2012 (the date

Graziadio returned to work part-time after Vincent's hospitalization), she has no

claims under the FMLA regarding Vincent.  See CIA Brief, pp. 21 ("CIA could not

have interfered with any right for Graziadio to take future leave for Vincent which

she never requested."), 23 ("there is no dispute that Graziadio never requested any

specific days off from work after June 27 to care for Vincent").

What is most remarkable about this argument is that there is absolutely no

evidence to support it.  It is a lawyer's argument concocted after the fact and

without regard to the absence of evidence to support it and the depth of evidence to

the contrary.  Instead, as discussed below, the evidence is unequivocal that (1)

Garrioch was refusing to return Graziadio to work because of her issues with the

4

leave for Vincent and (2) Graziadio explicitly requested future intermittent leave for Vincent.

1.  Garrioch's interference was almost
    exclusively regarding the FMLA leave for Vincent.

The overwhelming weight of evidence is that once Garrioch took exclusive control of Graziadio's FMLA leave, her issue was with all aspects of the leave for Vincent; and it was her issues with the leave for Vincent that drove Garrioch's refusal to allow Graziadio to return to work.

Consider the following unequivocal communications from Garrioch to Graziadio which explicitly state the above proposition.

(a) July 17, 2012, Garrioch's first communication with Graziadio opens with the pronouncement that Garrioch had "reviewed this paperwork [regarding Vincent] and cannot accept it to justify your absences from the workplace" and after a detailed explanation of her concerns regarding the impact of Vincent's diagnosis on Graziadio's ability to focus on her work at the CIA, Garrioch concludes the communication by threatening workplace discipline based on the unexcused absences.[2]  A459; see also A458 (said letter was sent "with regards to [Graziadio's] absences from the office").

---

[2] While your affiant is inclined to insert the entire content of these communications by and between Graziadio and Garrioch into this Reply Brief since they so obviously contradict CIA and Garrioch's defense, conscious of the limited word count these communications are instead truncated to their most relevant portions.

(b)  July 20, 2012, Garrioch's second communication with

Graziadio is similarly almost exclusively about Vincent and again threatens

disciplinary action based on "unexcused" absences to care for Vincent, identifies

alleged problems with the documentation provided regarding Vincent with

Garrioch noting:  "In fact, you have been absent from the workplace since early

June, save for a few partial days near the end of June to assist with a payroll run."

Garrioch concludes this second communication with an unequivocal statement that

the leave for Vincent is why she was refusing to allow Graziadio to return to work:

> [W]hat you have provided is not satisfactory evidence for
> your ongoing and continuing absence from work. Should
> you not be able to provide this justification, your absence
> will be deemed unexcused.

A468.

(c)  July 23, 2012, Garrioch's third (and final substantive)

communication with Graziadio which states as clear as day that regarding the

previously taken leave for Vincent, Garrioch "continue[s] to not have what the CIA

requires to justify your absences from the workplace" and stating:  "I cannot allow

you to return to work until you have presented sufficient documentation to justify

your absences as being medically necessary under FMLA law . . . In the meantime,

6

your continuing full time absence from work is considered unauthorized and unexcused."  A477 (emphasis added).[3]

All of this is consistent with Garrioch's deposition testimony, which was explicit -- she was refusing to allow Graziadio to return to work based on the previously unexcused absences regarding the leave for Vincent.

> Q:    Now, as of July 20th, were you taking the position that she couldn't come back to work until her absences were deemed approved FMLA according to you?
>
> A:    I did take the position that her documentation didn't justify either her absences or her part-time work schedule. And again, I'm not the one that schedules the standards. It's set by the FMLA.
>
> Q:    Okay. But you weren't going to let her come back to work until you had deemed her FMLA leave to be approved; right?
>
> A:    I communicated that to her on July 23rd, after she continued to resist my efforts to educate her on this and what her efforts were.

A594 (objection omitted).

---

[3] Query on what basis CIA and Garrioch can possibly contend that Graziadio returned to work from the leave for Vincent "without incident"?  CIA Brief, p. 40.

2. Graziadio repeatedly requested and was
   denied intermittent leave to care for Vincent.

CIA and Garrioch claim that it is undisputed that Graziadio never requested intermittent leave for Vincent. CIA Brief, pp. 7 (from "June 18, 2012 until the cessation of her employment, Graziadio did not request to use any intermittent FMLA leave to care for Vincent"), 16 (same), 24 (dismissal is appropriate "because Graziadio [] never requested or attempted to actually use any FMLA leave after June 27, 2012 to care for Vincent").

Like the former factoid, this factual contention is contrived of whole cloth and lacks even a scintilla of evidentiary support. Instead, all evidence conclusively proves that Graziadio both formally and informally, and repeatedly, requested intermittent leave for Vincent.

Dispositively, CIA has conceded the opposite of what it contends in this argument point, to wit: Graziadio submitted a "medical certification form []in connection with Vincent's illness [which] included a request by Plaintiff for intermittent FMLA leave." A43 at ¶ 26 (referring to A229-231). This undisputed request for intermittent leave to care for Vincent was prepared and submitted by Graziadio in the third week of June, 2012 (prior to TJ's accident) and "processed" by CIA at least as early as July 5, 2012 (which is weeks prior to Garrioch's official involvement). A391-392 at ¶¶ 25-29.

That CIA conceded this point in its Rule 56 statement makes sense since <u>all of the evidence</u> is that Graziadio made such a request. Consider the following:

(i) Graziadio submitted a formal request for intermittent leave to care for Vincent especially as it regards "diabetes management/education, monitoring blood sugar, insulin administration, patient is a minor." A231.

(ii) Prior to TJ's accident and up through Graziadio's return to work part-time, Graziadio requested, and received intermittent leave to care for Vincent. A443-447, A452, A453-454.

(iii) Graziadio's first detailed report after TJ's accident, explained: "I have been trying figure out how I can get in there this week and I don't see how it is feasible <u>between caring for both Vincent and TJ now</u>." A452 (emphasis added).

(iv) Graziadio's second detailed report after TJ's accident explained: "Sorry, it has been another one of those days. At this point I will not be able to come back to work on a full time basis <u>with the care that is needed here</u>." A456 (emphasis added).

(v) Graziadio's first response to Garrioch's July 17, 2012 threatening letter, within which Graziadio is begging for her job and offering to do whatever Garrioch needed/wanted, including: "If you require specific notes from Vincent's doctor every time I need to be here such as when he needs to be closely monitored I can get them for you." A462-463.

(vi)    Graziadio's July 18, 2012 email to Garrioch (her second response to Garrioch's July 17, 2012 threatening letter) is a detailed explanation of why Graziadio was requesting and needed intermittent leave to care for Vincent:

> [Y]ou speak about that there is not an estimate of the days and hours that my son will require care. As the doctor explained, it is a chronic illness and no-one knows how much care will be involved which is why if it is a bit ambiguous or not clear enough for you it should be understandable why it would be.  It does, however, state that there may be days where monitoring will be needed and that is one of the reasons why I had to stay home with him and may in the future have to stay home with him.  However, if you require the doctor to go into greater detail of what it means to have his illness and that care that will be involved I will request this from her.

A464.[4]

(vii)    Graziadio's July 19, 2012 email to Garrioch further explains her needs in regards to intermittent leave for Vincent including those situations where she may " need to be home with him because of his illness . . . or if he needs to go to the doctor I will take him to his appointment . . ."  A466.

(viii)  Sensing some confusion on Garrioch's part, on July 20, 2012 Graziadio emailed a more concise attempt to clarify:

---

[4] As with the communications from Garrioch, see supra n.3, these communications from Graziadio are not reproduced in full in this Reply Brief and instead truncated for purposes of limited word count and the Court is directed to the exhibits themselves for their full (and highly probative) content.

10

Currently, I have two separate requests for FMLA leave:
The first request: Intermittent FMLA leave to care for my
son, Vincent. Vincent was recently diagnosed with Type
I Diabetes. I have previously sent you a medical note
from his doctor indicating that Vincent may need care on
an unscheduled basis based on his condition. This is
potentially life threatening condition that needs constant
monitoring and unscheduled visits to the doctor. By and
large this is unpredictable and cannot be scheduled. In
such cases, I will provide a doctor's note for each
occurrence if you require such. As I stated, Vincent's
doctor has provided you with the appropriate
documentation for this condition. Additionally, at my
request, the doctor's office has attempted to contact you
today to discuss what further documentation you need.

A469.[5]

    3.    <u>CIA's evidence to the contrary is frivolous at best.</u>

CIA props up two pieces of evidence that it contends stand for the

proposition that Graziadio never asked for intermittent leave to care for Vincent

during two distinct time periods:[6] (i) June 18, 2012 through June 27, 2012 (citing

Graziadio's deposition testimony); and (ii) June 28, 2012 thereafter (citing

Graziadio's July 18, 2015 email to Garrioch). <u>See</u> CIA Brief, pp. 22-23. The

---

[5] It is because Garrioch was harping on the deficiencies regarding the previously-taken and
requested future leave for Vincent that Graziadio asked Vincent's doctor's office to contact
Garrioch directly; which in turn led to even more certifications being volunteered by Graziadio
and Vincent's treating physician. <u>See</u> Graziadio Brief, pp. 29-30.

[6] Interestingly, CIA and Garrioch (and Judge Roman) ignore an entire period of time, which is
the full time taken to care for Vincent from June 6, 2012 through June 18, 2012. This is
especially notable since Garrioch made clear that her reason for refusing to return Graziadio to
work was based on purported unexcused absences dating back to "early June." A468.

former is inapposite as a matter of fact and law. The latter has been recklessly misrepresented by CIA Counsel. Each is discussed in turn below.

(a) Graziadio's deposition testimony is not dispositive.

Judge Roman's reliance on this bit of Graziadio's deposition testimony is discussed in detail in Graziadio's principal brief (at pages 18-20). CIA's doubling-down on same requires reply.

Notwithstanding the unequivocal evidence to the contrary, CIA contends that the excerpted deposition testimony proves (without question) that "from June 18, 2012 through June 27 . . . she did not need, and therefore did not request, any additional leave to care for Vincent." CIA Brief, p. 22-23 (referring to A196-197).

Upon review of the transcript excerpt, it is apparent that Graziadio is confused by the question and when given the opportunity makes explicit her confusion by stating "I don't remember" in answer to whether she had taken leave during the period of time June 18, 2012 through June 27, 2012. This equivocal deposition testimony is far from dispositive for the untrue fact that Graziadio never asked for future intermittent leave regarding Vincent.

The Court's holding in Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (cited by CIA and Garrioch) is instructive. CIA and Garrioch would have the Court extend Brown's holding such that Graziadio is prohibited from introducing any evidence that "contradict[s] her own sworn deposition testimony."

12

CIA Brief, p. 23 n.4.  This is an inaccurate reading of the holding in Brown and its predecessors and progeny.

First, the rule only applies when the contradictions are "real, unequivocal, and inescapable."  In re Fosamax Products Liab. Litig., 707 F.3d 189, 194 & n.4 (2d Cir.) cert. denied sub nom. 133 S.Ct. 2783, 186 L.Ed. 2d 234 (2013).  Absent such unequivocal contradiction, the Court "may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury."  Id.; Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (Rule does not apply where the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition).

Second, the "sham fact" rule applies only when the "factual issue [is] created solely by an affidavit crafted to oppose a summary judgment motion . . ."  Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) (emphasis added); Kennedy v. City of New York, 570 F.App'x 83, 84 (2d Cir. 2014) (dismissed because "in the absence of the affidavit there is no proof"); see also Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc., 160 F.3d 106, 112 (2d Cir.) amended, 169 F.3d 782 (2d Cir. 1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an

13

earlier account that was ambiguous, confusing, or simply incomplete."); <u>Hayes</u>, 84 F.2d at 620 (where deposition testimony is "only arguably contradictory" Court should not "draw[] an improper inference as to the plaintiff's credibility"); <u>Neidich v. Estate of Neidich</u>, 222 F.Supp.2d 357, 369-70 (S.D.N.Y. 2002) (same).

Third, to the extent the "sham fact" rule applies, it applies only regarding exclusion of the affidavit itself, and nothing else. <u>Id.</u>

(b) <u>CIA's citation to A262 is reckless at best.</u>

In its Brief at page 23, CIA Counsel points to Graziadio's July 18, 2012 email from Graziadio to Garrioch (A262) as alleged incontrovertible proof that Graziadio "informed CIA that her absences following June 27, 2012 were related to TJ . . ." CIA Brief, p. 23.[7] Again doubling-down, counsel for CIA proffers that the email (at A262) also contains a statement limiting the requested leave to care for Vincent to "the ten days in June when Graziadio was absent due to Vincent's illness . . ." CIA Brief, p. 23. Hence, CIA Counsel contends, remarkably, there is

---

[7] Judge Roman goes way afield in relying on the deposition excerpt to support the unequivocal proposition that Graziadio "never actually sought to take additional leave for Vincent." <u>See</u> SA11; <u>see also</u> SA3 (citing only the deposition testimony at issue). Even assuming that Judge Roman is correct that the deposition testimony somehow creates an undisputed fact (which is does not), it does so <u>only</u> for the period through June 27, 2012, and not thereafter. It is for this reason that CIA and Garrioch are now straining in their brief to find evidence to support their alleged undisputed factual contention that Graziadio did not seek future leave regarding Vincent after June 27, 2012.

no dispute that Graziadio ever "requested or attempted to actually use any FMLA leave after June 27, 2012 to care for Vincent . . ."  CIA Brief, p. 24.

First, this interpretation is unreasonable.  In her email Graziadio is simply asking for clarification, not making any declarative statement of fact.

Second, in the very next paragraph Graziadio explains her need (and request) for future intermittent leave for Vincent.  See A262 (providing detail to her request for future intermittent leave to care for Vincent).

Third, and most notably, counsel has egregiously misrepresented the communication memorialized at A262, which of course makes reference to the continued care for Vincent, stating in full rather than as redacted by counsel:  "I wanted to get clarification please on which time off you are referring to.  Is it the ten days I took off in June for my son Vincent when he was in the hospital and the immediate care after that you are saying was not justifiable?  Or are you talking about the time I have taken off in July to care for my son Thomas who was also hospitalized and cannot possibly be left alone that is not justifiable?"  A262 (emphasis added).

15

B.  There is More Than Ample Evidence
    that Garrioch Interfered with Graziadio's
    <u>FMLA Rights as it Regards the Leave for TJ</u>

    1.  <u>Garrioch interfered with approved leave.</u>

    The entire premise of this argument point fails because there is more than

sufficient evidence for a jury to conclude that the leave for TJ was approved --

hence was "leave" for purposes of the FMLA -- leave with which Garrioch and her

counsel explicitly interfered.  Graziadio Brief, pp. 17-20; <u>see also</u> A609 and A614

(Garrioch testifying that Graziadio was terminated for failing to return "from

leave").  Additionally, the Court is asked to note the following additional evidence

that contradicts CIA and Garrioch's argument.

    (a)  Internal CIA communications reference Graziadio being on

FMLA leave.  A243-244; A453-454; A506-507; A509-510.

    (b)  CIA and Garrioch have conceded that "Defendant Gardella asked

for a temp to be hired to assist some of [Graziadio's] responsibilities if she was

going to continue to be absent from work <u>due to FMLA leave</u>."  A886 (emphasis

added, citing A506).

    (c)  The termination letter expressly references alleged job

abandonment "following your leave of absence in connection with the care of your

sons . . ." A497.

16

(d)  The official personnel action form, memorializing the reason for the termination from employment, provides that it was because Graziadio "Failed to return from leave."  A511.

2.    There was never a timely request for medical certification.

As shown in Graziadio's principal brief (at pages 25-28), there is more than sufficient evidence that the first-ever request for "paperwork" regarding TJ (A459) was not a proper request for medical certification regarding TJ for many reasons, including:  (i) it was not a proper request for certification as required per the regulations, 29 C.F.R.§ 825.305, and instead requested undescribed "paperwork" without noting consequences, etc.; (ii) to the extent there was a request for certification, it was untimely; (iii) there was no excuse for the lateness of the request; and (iv) to the extent it was a request for certification, it failed to advise Graziadio of the consequences.  Graziadio Brief, pp. 25-28.

In reply to CIA's Brief, Graziadio offers the following.

(a)    Medical certification must be requested in writing for each leave instance.  That CIA may have complied with its nominal obligations regarding notice of FMLA Rights, see CIA Brief, pp. 26-27, has nothing to do with the statutory and regulatory obligation to provide written notice of the need for medical certification within five days.  29 C.F.R. §§ 825.300(c)(1), 825.305(a) ("An employer must give notice of a requirement for certification each time a

17

certification is required; such notice must be written notice whenever required by § 825.300(c).").

(b)     CIA and Garrioch's offer a brand new argument in their brief, stating without any legal support that the triggering date should by July 9, 2012 instead of the date Graziadio notified her employer of the need for leave to care for TJ.  See CIA Brief, p. 27-28.  This is off-point and irrelevant since even if the date is July 9, 2012, Garrioch was well past the five-day deadline, without an excuse. See Graziadio Brief, pp. 22-23.

(c)     The CIA policy is irrelevant and does not obviate the notice requirement.  Perry v. Jaguar of Troy, 353 F.3d 510, 514 (6th Cir. 2003); Harcourt v. Cincinnati Bell Tel. Co., 383 F.Supp. 2d 944, 961 (S.D.Ohio 2005); Henderson v. Whirlpool Corp., 17 F.Supp.2d 1238, 1246-48 (N.D.Okla. 1998).

(d)     In more overzealous advocacy, CIA Counsel asserts without citation that the excuse for the late request for "paperwork" was because "Graziadio had already missed almost one month of work purportedly to care for TJ . . ."  CIA Brief, p. 29.  This assertion should be disregarded for two reasons. First, there is absolutely not a scintilla of evidence that this was the reason Garrioch decided to issue a late request for medical certification.  In fact, the very first time any such proposition was articulated was by Judge Roman in his decision on summary judgment.  There is no testimony or documentary evidence that

18

supports this post-hoc, judicially-crafted excuse.  Most notably, there is not a shred

of record evidence that Garrioch <u>has ever</u> articulated anything of the sort.

Second, it is blatantly inaccurate.  Graziadio did not "miss[] almost a month

of work" to care for TJ, she missed nine days <u>total</u> before Garrioch refused to allow

her to return to work.  <u>See</u> Graziadio Brief, p. 26 n.10.

3.    Even if there was a timely request, the alleged
      <u>deficiencies were both not credible and not presented properly.</u>

Graziadio refers the Court to her principal brief for a detailed discussion

with citation to the fatal errors associated with Garrioch's alleged deficiencies

regarding the paperwork for TJ.  In reply to CIA's Brief, Graziadio offers the

following.

(a)  The information provided by Graziadio, including the doctor's

note provided, creates a question of fact as to whether Graziadio had at that time

satisfied the statutory and regulatory obligations of sufficient certification

regarding the leave for TJ.  Garrioch's only stated deficiency ("it does not state that

there was any medical necessity for you to provide full time medical care," A477)

is nowhere to be found in the statutory and regulatory framework.  Instead, the

statute and the regulations require that Graziadio provide "A statement or

description of appropriate medical facts regarding the patient's health condition for

which FMLA leave is requested."  29 C.F.R. § 825.306(a)(3); <u>see also</u> 29 U.S.C.A.

19

§ 2613(b)(3) (requiring "the appropriate medical facts within the knowledge of the health care provider regarding the condition"). Here, the doctor's note states explicitly such information: "Closed Fracture Of The Shaft Of The Tibia With The Fibula." A473. Especially when combined with Graziadio's repeated explanations as to her need to be home with TJ immediately after the surgery, a reasonable jury could easily conclude that Graziadio satisfied her certification obligations, even if timely requested.

(b) Immediately after receiving Garrioch's email citing the single claimed deficiency, and given the clarity in the doctor's note sent, Graziadio thought that there might have been some confusion or problems in transmission and therefore resent the doctor's note. A403 at ¶ 66. As such, at the time Garrioch cut off all forms of communication, Graziadio had every reason to believe that the deficiency had been cured -- or at the very least that the issue was forestalled until their meeting. See id.; see also A478-479 (Garrioch cutting off any further communication).

(c) It is not clear why CIA Counsel cites to A785 for the proposition that "[u]nlike the note she submitted in connection with her absences beginning June 27, 2012, the March 2012 doctors' notes clearly justified Graziadio's absences for the entire leave period." See CIA Brief, p. 32. This is confusing for two reasons. First, A785 is not the paperwork submitted regarding the March 2012

20

leave.  Instead, the doctor's notes submitted in March 2012 are at A433-435.  And, second, the paucity of information in A785 stands in remarkably stark contrast to the detail in A433-435 (the prior doctors notes) and A472-473 (the doctor's note submitted for TJ).

4.     There is no evidence to contradict the fact
       that Garrioch ceased all forms of communication with Graziadio.

There is overwhelming evidence that Garrioch interfered with Graziadio's efforts to schedule the Garrioch's demanded face-to-face meeting.  See Graziadio Brief, pp. 35-39.  Illustrative is the contention in the CIA Brief that "Graziadio never provided Garrioch with any dates and times for a proposed meeting and merely responded that she was available to meet "at any time."  CIA Brief, p. 12 (emphasis added).  In actuality Graziadio appropriately responded each time Garrioch asked to schedule a meeting by offering not "merely" any time, but by offering a multitude (nearly infinite) dates and times to meet (hence, "at any time").  That's not obstinacy, that's desperation.  Cf. A231-232 (Garrioch mocking Graziadio about her need to care for her son Vincent); see also A404 at ¶ 73; A483.

CIA argues against the obvious tolling consequence of Garrioch ceasing all forms of communication by proffering that "because she submitted a certification . . . there was no deadline period to extend in the first place."  CIA Brief, p. 33. However, this legally unsupported argument is inaccurate.  The tolling provisions

21

cited apply across the board and not just to some undefined "deadline period" referenced by CIA and Garrioch.  See Graziadio Brief, pp. 33-35.

     5.    <u>Graziadio's request to return without future leave is relevant.</u>

CIA and Garrioch, having gone all-in on the fabricated notion that there were no impediments as it relates to any intermittent leave for either Vincent or TJ, now contend that the fact that Graziadio made an unequivocal request to return to work without any future intermittent leave is irrelevant.  CIA Brief, pp. 33-36.

As shown above, the premise is inaccurate.  Garrioch had lots of issues with the request for prospective intermittent leave for Vincent -- and was using that as an excuse to refuse to return Graziadio to work.  That Graziadio sought to lift at least that impediment speaks to her zealous efforts to get back to work.

     6.    Attorney Lynett and Garrioch worked together
              <u>to continue the interference and retaliation against Graziadio.</u>

Attorney Lynett engaged in a series of contrivances that constitute continued interference, retaliation and discrimination, including (i) the false promises to Graziadio's then-counsel Ranni to keep the matter between counsel; (ii) the confusing and inherently contradictory August 30, 2012 email with impossible deadlines; (iii) the fake heads up letter; and (iv) the failure to take appropriate action once Graziadio begged for her job back.  See Graziadio Brief, pp. 39-46.

22

<u>REPLY TO POINT III</u>

<u>GRAZIADIO'S FMLA RETALIATION</u>
<u>CLAIM SHOULD PROCEED TO THE FACTFINDER</u>

A.    <u>Introduction</u>

CIA and Garrioch's argument here is internally contradictory, even in the

first paragraph, arguing that:  "Graziadio was not entitled to reinstatement [] and

CIA terminated her employment for failing to contact her supervisor to return to

work . . ."  CIA Brief, p. 38.  Hence, according to CIA, Graziadio had no right to

reinstatement, her absences had not yet been deemed FMLA leave, and Graziadio

was obligated to return to work.  Fair to say that when a jury hears this argument

they will find it suspect at best.

B.    Vincent's Leave Was the Reason Garrioch
        <u>Refused to Allow Graziadio to Return to Work</u>

Judge Roman's fact finding, adopted by CIA, is that everything about

Vincent was a distraction and that TJ "drove the conversation."  SA10-11.

Therefore, according to CIA and Garrioch, the leave for Vincent had been

approved in all regards and cannot form the basis of the FMLA retaliation claim.

CIA Brief, p. 40 ("Following [the leave for Vincent], CIA reinstated Graziadio to

her position without incident.").

Not only is this a question of fact for the jury, it is just not true.  As shown

above, Garrioch's issue was primarily the leave for Vincent.  Indeed, as far as

23

Garrioch was concerned, Graziadio's leave for Vincent (past and future) was <u>never</u> <u>even approved</u> and hence ripe for Garrioch to obstruct and deny.  A570, A574, A586, A591-592, A597.[8]

The only evidence cited by CIA to support the proposition that Graziadio was returned to leave from Vincent "without incident" is instructive.  CIA cites to three pages of the record -- A188, A194 and A246.  <u>See</u> CIA Brief, p. 40.  A188 has nothing to do with the leave for Vincent.  A194 is Graziadio's deposition testimony that she returned to work part-time from her leave for Vincent.  And A246 is Gardella's email advising that Graziadio's paperwork had been processed. All of this evidence is <u>prior to Garrioch's involvement</u>.  To argue that once Garrioch got involved and took exclusive control there was "no incident" regarding the leave for Vincent is a very serious misrepresentation of the record.

And in regards to the leave for TJ, there are as discussed <u>infra</u> and in Graziadio's principal brief just as many questions of fact as to whether or not the leave taken for TJ was FMLA leave and can therefore form the basis for the retaliation claim.

---

[8] Remember, Judge Roman dismisses this probative fact with the simple statement that Garrioch was simply inaccurate.  SA10.

24

C.   There is Overwhelming Evidence of Pretext

    1.   Introduction

The evidence of pretext is overwhelming, and nothing in CIA and Garrioch's argument on this point deflates such abundance.  The Court is respectfully referred to Graziadio's principal brief at pages 48-55 for the full detail of the evidence supporting pretext.  In reply to CIA's Brief, Graziadio offers the following.

    2.   There Was No Clear Instruction to Contact her Supervisor

Tripping over the internal inconsistencies, CIA offers a sub point that argues:  "[A]lthough Graziadio was still required to provide all necessary medical certifications to justify the medical necessity of her leaves of absence, she should contact her supervisor if she wished to returned to work."  CIA Brief, pp. 42-43.

There are material questions of fact as to this proposition discussed in detail in Graziadio's Brief (at pages 42-46) and left unaddressed in CIA's Brief.

In addition, CIA and Garrioch's proposition that there was a "clear instruction" to contact her supervisor, CIA Brief, p. 43, is belied by the record (see Graziadio Brief, pp. 42-46) and raises questions of fact regarding alleged job abandonment that are suitable only for a factfinder.

    3.   CIA's Brief is More Proof of Shifting Reasons

CIA and Graziadio have changed their proffered reasons for the adverse employment actions repeatedly throughout the underlying events.

25

During the course of Graziadio's efforts to return to work in June through September 2012, the proffered reason for the adverse employment actions was insufficient paperwork for already-taken and future-intermittent leave regarding both of Graziadio's sons, but most especially regarding the leave already taken and proposed into the future for Vincent.  See supra; see also A570 (Garrioch stating that the leave (already taken and proposed intermittent) was never approved "because the box has not been checked"); A574 (Garrioch rejecting the paperwork); A586 (regarding Vincent, questioning whether it was reasonably objective for Graziadio to return to work); A591-592 (rejecting Vincent's paperwork); A597 (Garrioch complaining that Graziadio was "asking for a lifetime" of leave).

At the time of discharge (now after Attorney Lynett's involvement), the proffered reason changed to one of job abandonment, with the appropriateness of the leave essentially conceded.  A497 (discharge letter acknowledging that Graziadio was on "leave to care for your sons" and concluding (remarkably) "it is obvious to us that you do not want to return to work."  See also A511 (noting reason for termination as failure to return from leave).

In their summary judgment motion CIA and Garrioch proposed a new reason that had nothing to do with the previously-taken leave for Vincent, and instead was

26

now about the proposed future intermittent leave for Vincent combined with the alleged insufficient paperwork for TJ.  A46-47 at ¶¶42-44; A48 at ¶¶ 50, 52, 53.

And now, on appeal, CIA, Garrioch and Attorney Lynett, have stripped away yet another panel, and now claim the reason for the adverse employment actions was exclusively the inadequate paperwork regarding the previously-taken leave for TJ.  Magically, everything Garrioch said about her refusal to return Graziadio to work because of insufficient paperwork regarding Vincent, and insufficient paperwork regarding the previously-taken leave taken for TJ has disappeared.

These type of rhetorical maneuverings by counsel, especially when so obviously post-hoc and so apparently wholly unsupported by the record, should not be countenanced.

CIA and Garrioch offer a single sentence to counter all of this evidence of shifting reasons, asserting that "CIA consistently informed Graziadio that the medical certification she submitted did not support her request for leave for TJ . . . [and that] CIA afforded Graziadio ample notice of the deficiencies in her medical documentation."  CIA Brief, p. 43.

This is just not true.  Instead, to the extent anyone at CIA ever makes any reference to challenges to the leave for TJ it is in three emails -- and only the last of the three articulates any alleged deficiency.  Hence, on July 17, 2012, Garrioch

27

for the very first time even mentions the leave for TJ (as an aside to a lengthy attack on the adequacy of the certification regarding Vincent) and asks for Graziadio to submit "paperwork."  A459.  Similarly, Garrioch's next communication that even mentions the leave for TJ is on July 20, 2012, when Garrioch (again as an aside to a lengthy attack on the adequacy of the certification regarding Vincent) asks for "any other documentation pertaining to your other son [TJ] . . ."  A468.

It is not until July 23, 2012 (the final of three emails from Garrioch) that Garrioch (again as an aside to an attack on the adequacy of the certification regarding Vincent) attempts to identify a deficiency in the doctor's note submitted regarding TJ, stating in full:  "With regards to the note that you attached to this email, it says that the minor child can return to school.  It does not state that there was any medical necessity for you to provide full time medical care."  A278.

Not only is this purported deficiency far from clear given the content of the doctor's note, this email concludes with the instruction that Garrioch will not discuss any of the matters absent a face-to-face meeting.  A278.  When Graziadio responded with confusion and resubmitted the doctor's note thinking there was a transmission error, Garrioch responded with the curt instruction that:  "As per my last email, we will no longer be discussing these matters over email."  A280.

From that moment on, Garrioch never communicated with Graziadio.

To argue that this exchange is proof that there was "ample notice of the deficiencies in her medical documentation," CIA Brief, p. 43, is a wholly conclusory argument unsupported by any record evidence

4.     The similarly situated employee evidence is on point.

CIA and Garrioch offer only conclusory statements to challenge the evidence of animus perpetrated by Garrioch against similarly situated employees. Indeed, Zubulake v. UBS Warburg LLC, 382 F.Supp.2d 536 (S.D.N.Y. 2005), a veritable treatise on the admissibility of this very type of evidence, is applicable. Upon review of the evidence cited, it is submitted that the Court will find it not just pertaining to similarly-situated employees, but more often identically-situated employees subject to "The Terminator's" (A728 at ¶ 8) harsh treatment in regards to FMLA leaves and disability discrimination.

5.     The unemployment compensation decision is relevant.

Inexplicably, CIA Counsel asserts that "Graziadio cites no cases, nor can she, holding that a determination by the New York State Department of Labor that an employee was not terminated for misconduct is somehow evidence of pretext in a subsequent retaliation claim."  CIA Brief, p. 46.

Graziadio did cite cases, two of them to be exact, that stand for that exact proposition.  See Graziadio Brief, p. 52.  And not only did Graziadio cite such precedent, so did Judge Roman in his remarkable footnote within which Judge

29

Roman sits as fact finder and -- notwithstanding the case law he cites -- decides to reject this evidence because Judge Roman "does not agree with the DOL's conclusion . . ." SA17 (acknowledging that "Judges in this district previously admitted such DOL findings at jury trials in employment discrimination cases and afforded the findings weight on summary judgment").

It is worth noting, finally, that there is absolutely no record evidence to support the contentions made in footnote 13 regarding what CIA did or did not submit to the DOL.

6.    Graziadio's stellar employment record is relevant.

Without citation, CIA contends that Graziadio's unblemished employment record is "inadmissible hearsay" and "irrelevant." CIA Brief, p. 47. This is contrary to well established precedent. See Graziadio Brief, p. 54.

7.    CIA planned on replacing Graziadio.

CIA and Garrioch ignore the probative (and damaging) evidence offered by Steve Botti regarding CIA and Garrioch's intention to replace Graziadio, even during the time she was on FMLA leave (see Graziadio Brief, p. 55), by myopically only addressing the temporary hire issue. CIA Brief, p. 47. In essence, the fact that CIA and Garrioch planned on permanently replacing Graziadio while she was still on FMLA leave is now uncontroverted.

30

## REPLY TO POINT IV

### GRAZIADIO'S ASSOCIATIONAL DISABILITY DISCRIMINATION CLAIM SHOULD PROCEED TO THE FACT FINDER

As shown seriatim, and discussed at pages 56-57 of Graziadio's principal brief -- including extensive citation to Garrioch's admission that she was concerned about Graziadio being distracted because of Vincent's illness --, Graziadio's ADA discrimination claim is ripe for a factfinder.

CIA and Garrioch's contention that this claim should go away because Graziadio returned to work on June 18, 2012 "without incident," CIA Brief, p. 50, is illustrative. Yes, it is true that before "The Terminator" Garrioch became involved, Graziadio enjoyed the prerogatives of FMLA leave regarding the leave for Vincent. However, for CIA and Garrioch to assert that Graziadio returned from said leave "without incident" once Garrioch became involved is absurd. Instead, as is more than proven by the record evidence, once Garrioch became involved, she immediately and indefensibly interfered with and then discriminated against Graziadio because of her association with Vincent and because Garrioch had specific (unreasonable and irrational) concerns about Graziadio's ability to work undistracted given her association with a child with diabetes. See Graziadio Brief, pp. 56-57.

## CONCLUSION

For these reasons as well as the entire record before the Court it is submitted that Judge Roman's decision and judgment dismissing this matter on summary judgment should be reversed and this matter remanded for proceedings before a fact finder.

Dated:    Rhinebeck, New York
            October 19, 2015

Nathaniel K. Charny (NC5664)
Charny & Associates
9 West Market Street
Rhinebeck, New York  12572
Tel - (845) 876-7500
Fax - (845) 876-7501
ncharny@charnyandassociates.com

Attorneys for Graziadio Cathleen Graziadio

**Federal Rules of Appellate Procedure Form 6.  Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed.R. App. P.32(a)(7)(B) because:

☑    this brief contains 6,985               words, excluding the
      parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains    [state the number of]
      lines of text , excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of  Fed. R. App. P. 32(a)(5) and the
      type style requirements of Fed. R. App. P. 32(a)(6) because:

☑    this brief has been prepared in a proportionally spaced typeface
      using [ Microsoft Office Word 2016                      ] in
      [ 14 point Times New Roman            ], *or*

☐    this brief has been prepared in a monospaced typeface using
      [ state name and version of word processing program  ] with
      [ state number of characters per inch and name of type style ].

(s)  _____

Attorney for  Plaintiff-Appellant Cathleen Graziadio
      _____

Dated: October 19, 2015
      _____